# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 22, 2012

No. 07-41041

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

MARIA AIDE DELGADO,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, Chief Judge, and KING, JOLLY, DAVIS, SMITH, WIENER, GARZA, BENAVIDES, STEWART, DENNIS, CLEMENT, PRADO, OWEN, ELROD, SOUTHWICK, HAYNES, and GRAVES, Circuit Judges.[*]

EDITH BROWN CLEMENT, Circuit Judge, joined by JONES, Chief Judge, KING, JOLLY, DAVIS, SMITH, GARZA, BENAVIDES, STEWART, PRADO, OWEN, ELROD, SOUTHWICK, and GRAVES, Circuit Judges:

Defendant-Appellant Maria Aide Delgado was convicted of (1) possession of marijuana with the intent to distribute and (2) conspiracy to commit the same offense. 21 U.S.C. § 841(a)(1) & (b)(1)(B); 18 U.S.C. § 371. She was sentenced to a concurrent term of 100 months' imprisonment for each conviction. Delgado appealed. A divided panel of this court vacated her convictions and sentences,

---

[*] Judge Higginson was not a member of the court when this case was submitted to the court en banc and did not participate in this decision.

No. 07-41041

dismissed the conspiracy charge, and remanded the case for further proceedings on the possession with intent to distribute charge. *United States v. Delgado*, 631 F.3d 685 (5th Cir. 2011). The panel opinion was vacated by our decision to rehear the case en banc. *United States v. Delgado*, 646 F.3d 222 (5th Cir. 2011). For the reasons stated below, we now affirm Delgado's convictions and sentence.

## I. FACTS AND PROCEEDINGS

Delgado was the sole owner-operator of TJ Trucking, a company that shipped Mexican produce from Laredo, Texas to destinations throughout the United States. Bartolome Vasquez, a Mexican legal resident employed by a Laredo produce broker and shipper, had, at the time of Delgado's trial, known and done business with Delgado for almost four years, during which time he assembled shipments of Mexican produce to be hauled by TJ Trucking. Vasquez dealt regularly with Delgado and estimated that they spoke approximately four times per month to arrange shipments. According to Vasquez's testimony, he regarded Delgado as a legitimate trucking business operator until, on September 8, 2006, she offered to pay him $10,000 if he would commingle 500 pounds of marijuana in a TJ Trucking delivery of Mexican broccoli to North Carolina. He refused her offer and immediately reported the incident to Immigration and Customs Enforcement (ICE) officers in Laredo. He then secretly began working with ICE officers, withdrew his initial refusal of Delgado's offer, and agreed to begin making arrangements for the concealed drug shipment. In cooperation with the ICE officers, Vasquez taped phone conversations he had with Delgado about the arrangements. These recordings confirmed that, in order to disguise the nature of the shipment, Delgado asked Vasquez to prepare two bills of lading—one for North Carolina, where the marijuana was bound, and one for New York, where the broccoli was bound. In the same taped conversation, Delgado and Vasquez discussed, in guarded language that Vasquez explicated on the stand, the number of boxes of broccoli that would have to be opened to

hold the marijuana; that the truck's interior would have to be heated to melt off some of the ice in which the broccoli was packed so that the increased weight of the marijuana would not arouse suspicion at a weigh station; and the possibility that the marijuana would be loaded at a different warehouse to avoid a run-in with Vasquez's supervisor. The ICE officers had planned to have Delgado deliver the truck containing the marijuana to rendezvous with Vasquez on September 11, 2006, at a government-controlled warehouse in Laredo, where they would make arrests and seize the drugs. The shipment was canceled, however, after, as Vasquez explained, "the person who was going to work with [Delgado]"—that is, the intended recipient—was arrested. Delgado called Vasquez to tell him that the shipment was off, that the bundles of marijuana were still in the cab of her truck, and that she was waiting until night to unload them and return them to an unnamed supplier.

Acting on this information from Vasquez, government agents went to Delgado's securely fenced and gated property, on which there were several buildings including Delgado's residence, a barn, and multiple small storage sheds and dog kennels. The agents signaled their arrival with flashing lights, sirens, and bullhorns, but no one on the property responded. Approximately thirty minutes later, after being prompted by a phone call from a neighbor, Delgado came out of the house and spoke with the agents at the gate. She eventually allowed three agents onto the property to conduct a search. Before letting them enter her house, however, she left them on the doorstep without warning or explanation, went into the house, locked the door, and then emerged approximately ten minutes later, claiming that she had needed to use the bathroom.

Consistent with Vasquez's report, the agents found a tractor-trailer parked in the yard. Delgado told the agents that she did not have the keys to its locked

No. 07-41041

cab; she claimed they were with the driver.[1] Delgado also told the agents she could not contact the driver because she did not have his telephone number. The agents eventually were able to open the tractor-trailer cab without the key. In its sleeper berth, they found thirty-four bundles of marijuana, weighing 507 pounds. Delgado expressed no surprise at the discovery but denied knowing that the marijuana was in the cab. She blamed her "drivers," whose "names" she claimed she could not recall. In fact, Delgado employed only one driver at that time, with whom she worked on nearly a weekly basis.

Around the time the cab was opened, another agent entered a room of Delgado's house in which she kept approximately ten large, threatening dogs chained to the walls. Inside a cabinet, the agent found a garbage bag filled with wrapping material that smelled of marijuana and held what appeared to be marijuana seeds and residue. Delgado expressed no surprise at this discovery, either; she told the agent she thought the bags had been used to wrap potting soil. She also said they might have been placed in the house by a man named Peter, who worked for her. She told the agent she did not know Peter's last name and did not have his contact information. In addition to the drugs, agents seized a substantial amount of ammunition and four firearms from Delgado's residence, including a loaded TEC–9,[2] but they did not arrest Delgado. Vasquez testified that Delgado called him after the search and expressed her anger that the agents had seized the drugs and guns. A month later, on October 11, 2006, ICE agents returned to Delgado's property with a search warrant, seized additional items, and arrested her.

---

[1] Albert Aguilar, Delgado's only driver at the time, consistently testified that the keys to the tractor-trailer were either kept in the truck or given directly to Delgado, that he knew of only one set of keys, and that he did not have them at the time the agents searched the truck.

[2] Agent Spivey of ICE testified that the TEC–9 is a weapon of choice for many drug traffickers.

No. 07-41041

Delgado was charged with possession of marijuana with the intent to distribute and conspiracy to commit the same offense, and following a two-day trial was convicted by a jury on both charges. The district court sentenced her to concurrent terms of 100 months' imprisonment.

## II. DISCUSSION

### A. Sufficiency of the Evidence

*1. Standard of Review*

Delgado's sole defense at trial was that she had no knowledge of the marijuana in her truck or of any plan to transport it.[3] She did not move for a judgment of acquittal under Rule 29 on the grounds that the government had not presented adequate evidence of an agreement with co-conspirators, and she therefore failed to preserve this issue for appellate review. *See United States v. Pierre*, 958 F.2d 1304, 1310 (5th Cir. 1992). Delgado additionally failed to raise an insufficiency claim on appeal. In fact, in her opening brief before the panel, Delgado conceded that there was some evidence supporting her conspiracy conviction[4] and requested a new trial on the conspiracy charge rather than a dismissal. Therefore, under this court's well-established precedent, Delgado had clearly forfeited any challenge to the sufficiency of the evidence supporting her conviction. *See, e.g.*, *Brinkmann v. Dall. Cnty. Deputy Sheriff Abner*, 813 F.2d 744 (5th Cir. 1987). The panel majority, however, scrutinized the sufficiency of the evidence and dismissed the conspiracy charge *sua sponte*. *Delgado*, 631 F.3d at 689, 693. We granted rehearing en banc in part to consider whether this *sua sponte* dismissal was appropriate and now conclude that it was not.

---

[3] Both her motion for a judgment of acquittal at the close of the government's evidence and her counsel's closing argument relied solely on her claimed lack of knowledge.

[4] Specifically, Delgado's opening brief refers to "the almost non-existent evidence of coconspirators." Even this view of the evidence against her, which the remainder of our discussion shows to be plainly inaccurate, admits the existence of *some* evidence, which is all that is needed to affirm the conviction under the applicable standard of review.

No. 07-41041

It is a long-standing rule that a defendant must make an appropriate objection at trial in order to preserve an issue for appeal. The Supreme Court, however, has long recognized the authority of the courts of appeals, as a limited exception to this general forfeiture rule, to correct particularly egregious forfeited errors. *See United States v. Atkinson*, 297 U.S. 157 (1936). In *Atkinson*, the Court articulated the "plain-error" standard to be applied to review of such unpreserved claims: "In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 160. Federal Rule of Criminal Procedure 52(b), originally enacted in 1944, codified what was understood as the existing plain-error practice of the courts of appeals under *Atkinson*.[5] *See United States v. Young*, 470 U.S. 1, 6–7, 15 (1985).

Although plain-error review is most frequently applied to errors not preserved by objection at trial, the Supreme Court, at least as early as 1962, had applied the identical plain-error standard announced in *Atkinson* to control those exceptional instances in which an appellate court corrects an error objected to at trial but abandoned by the defendant on appeal.[6] *Silber v. United States*, 370 U.S. 717, 718 (1962) (quoting *Atkinson*, 297 U.S. at 160) (recognizing power to

---

[5] Rule 52(b) provides: "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."

[6] The *Silber* Court therefore acknowledged a very limited and discretionary exception to the long-standing rule that appellate courts will not address non-jurisdictional errors not briefed by an appellant. *See, e.g.*, *Clements v. Macheboeuf*, 92 U.S. 418, 425 (1876) ("Matters not assigned for error will not be examined."). We have no obligation to address—much less ferret out—errors not presented in an appellant's opening brief, and as a general matter, such matters are forfeited. *See, e.g.*, *United States v. Banks*, 624 F.3d 261, 264 (5th Cir. 2010); *United States v. Avants*, 367 F.3d 433, 449 (5th Cir. 2004); *United States v. Barksdale-Contreras*, 972 F.2d 111, 115 (5th Cir. 1992); *United States v. Mejia*, 844 F.2d 209, 214 n.1 (5th Cir. 1988).

No. 07-41041

notice "plain error" if "the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of the judicial proceedings"). Thus, the plain-error test has long been applied to unpreserved and unpresented errors.[7] Moreover, in very rare instances, we have applied the plain-error standard to errors neither preserved below *nor* argued on appeal. *See, e.g.*, *United States v. Pineda-Ortuno*, 952 F.2d 98, 105 (5th Cir. 1992).

In *United States v. Olano*, 507 U.S. 725, 732–36 (1993), the Court clarified the plain-error standard and discussed the meaning of the language used in *Atkinson* and repeated in *Silber*. While maintaining that Rule 52(b) was a codification of its earlier precedents and emphasizing the relative continuity of its own plain-error practice, *id.* at 736, the Court explicitly took the case to standardize the plain-error test for the courts of appeals, *id.* at 731. As summarized in a later case, *Olano* explained that plain-error review under Rule 52(b) proceeds in four steps or prongs:

> First, there must be an error or defect . . . . Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it "affected the outcome of the district court proceedings." Fourth and finally, if the above three prongs are satisfied, the court of appeals has the discretion to remedy the error—discretion which ought to be exercised only if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Meeting all four prongs is difficult, "as it should be."

*Puckett v. United States*, 556 U.S. 129, ___, 129 S. Ct. 1423, 1429 (2009) (quoting *Olano*). This four-step test describes a single standard for plain-error review that

---

[7] Even on the assumption, which we reject, that a more flexible standard of review applies to unpresented points of error than to unpreserved errors, Delgado could not benefit from the more flexible standard because her insufficiency claim was both unpreserved and unpresented on appeal. A litigant who would otherwise face plain-error review on an unpreserved issue clearly cannot gain a more favorable standard of review by also failing to raise the alleged error on appeal.

applies equally to our review of unpreserved and unpresented errors.[8] *See Olano*, 507 U.S. at 736 (citing *Silber* as an example of the Court's consistent plain-error practice).

Although these general principles are settled by controlling Supreme Court precedent, it still may be helpful to clarify *Olano*'s significance. Prior to *Olano*, although our plain-error practice was in accord with Rule 52(b) and the Supreme Court's plain-error decisions, our cases used multiple formulations to describe the plain-error inquiry. In *United States v. Montemayor*, for example, we stated that we will consider points of error not raised on appeal only to 'prevent a miscarriage of justice.'" 703 F.2d 109, 114 n.7 (5th Cir. 1983). Other cases cited the language used in *Atkinson* and repeated in *Silber*, and corrected errors that "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *See, e.g.*, *United States v. Musquiz*, 445 F.2d 963, 966 (5th Cir. 1971).

Acknowledging the use of these and other formulations by the courts of appeals, *Olano* clarified that plain-error review proceeds in four discrete steps. Specifically, the Court emphasized that the "miscarriage of justice" standard quoted in our circuit and others, and the "fairness, integrity, public reputation" language used in *Atkinson* and *Silber*, are both formulations intended only to guide a reviewing court's exercise of its discretion under the fourth prong of the test. *Olano*, 507 U.S. at 736. These standards are therefore only applicable when the first three prongs of the test have been satisfied—they are not *alternatives*

---

[8] This acknowledgment that the same standard of review applies to both unpreserved and unpresented errors does not imply that these types of errors stand on equal footing before the courts of appeals. In the overwhelming majority of cases, we—along with every other circuit—simply do not review or address potential errors, plain or otherwise, not presented in the appellant's opening brief. We do, on the other hand, frequently address alleged errors pressed in this court that were not preserved by an appropriate objection below.

The present discussion merely clarifies that in those exceptional instances in which we *sua sponte* address an unpresented error, the applicable standard of review is the plain-error test, rather than a more flexible or subjective standard.

No. 07-41041

to the full four-prong test. Focusing only on the fourth prong of the analysis obscures the fact that the first three prongs of plain-error analysis are distinct requirements that must be satisfied before we have *authority* to correct an unpreserved error. *Id.* at 732–36.

The four-prong analysis is applicable to all forfeited claims of error and all errors not pressed on appeal, including Delgado's claim that the evidence was insufficient to support her conspiracy conviction. We review properly preserved claims that a defendant was convicted on insufficient evidence with substantial deference to the jury verdict, asking only "whether a rational jury could have found each essential element of the offense beyond a reasonable doubt," *United States v. Pennington*, 20 F.3d 593, 597 (5th Cir. 1994), and the plain-error test imposes an even stricter standard on unpreserved insufficiency claims. This is the natural result of the requirement of the second prong of the plain-error test that a defendant demonstrate not only error, but *plain* error. In this context, "plain" is synonymous with "clear" or "obvious." *Olano*, 507 U.S. at 734. "Plain" error is error so clear or obvious that "the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." *United States v. Hope*, 545 F.3d 293, 296 (5th Cir. 2008) (quoting *United States v. Frady*, 456 U.S. 152, 163 (1982)).

Applying this requirement of "obviousness," we have described the standard of review for unpreserved insufficiency claims in the most exacting language, stating that such a claim "will be rejected unless the record is *devoid of evidence* pointing to guilt or if the evidence is so tenuous that a conviction is shocking." *United States v. Phillips*, 477 F.3d 215, 219 (5th Cir. 2007) (emphasis added) (internal quotation marks omitted). Similarly, we have summarized the plain-error test's application to unpreserved insufficiency claims by stating that the court will reverse only if there is a "*manifest* miscarriage of justice." *See, e.g.*,

9

No. 07-41041

*United States v. Pierre*, 958 F.2d 1304, 1311 (5th Cir. 1992) (en banc).[9] We reaffirm these standards as proper applications of the plain-error test to claims of evidentiary insufficiency. Put simply, to satisfy the second prong of the plain-error test, Delgado must demonstrate not just that the government's evidence of conspiracy was insufficient, but that it was *obviously* insufficient.

In her en banc brief, Delgado attempts to lower this admittedly high bar by urging the court to reconsider our application of the plain-error test to insufficiency claims. Delgado contends that application of anything other than the general sufficiency standard, applicable in the district court on a motion for judgment of acquittal and in this court on properly preserved and presented claims, violates the Due Process Clause by allowing convictions to stand on insufficient evidence.

This constitutional argument is unpersuasive. Although due process requires the government to present evidence sufficient to prove each element of a criminal offense beyond a reasonable doubt, *see Jackson v. Virginia*, 443 U.S. 307, 316 (1979), the Constitution does not require that the sufficiency of the evidence be subject to *de novo* review in all cases. We routinely review constitutional claims under otherwise-applicable, deferential standards of review, and "[i]t is a truism that a 'constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.'" *United States v. Knowles*,

---

[9] Our cases citing the "manifest miscarriage of justice" standard have not always explicitly recognized that they were applying the four-prong plain-error test. In *Pierre*, however, we expressly acknowledged, en banc, that the "manifest miscarriage" language was simply a formulation of the plain-error test's application to insufficiency claims. Following *Olano*, it is clear that the full four-prong analysis is applicable to forfeited insufficiency claims. Although the plain-error test should always be cited, we recognize that the "manifest miscarriage of justice" formulation is itself a reasonable restatement of the four-prong test. The word "manifest" means clear or obvious, satisfying prong two, while "miscarriage of justice" satisfies prongs three and four in the case of a defendant being convicted on less than sufficient evidence.

No. 07-41041

29 F.3d 947, 951 (5th Cir. 1994) (quoting *Yakus v. United States*, 321 U.S. 414, 444 (1944)). Moreover, even if we found merit in Delgado's argument specific to the sufficiency standard, we are bound by the Supreme Court's plain-error cases, which we do not read as allowing for any exceptions to the application of the plain-error test for forfeited claims. *See Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009) (rejecting "the creation of an unjustified exception" to Rule 52(b), which applies to "all" forfeitures).

We recognize that there is some support for the contention that application of the plain-error standard often bears little practical difference from application of the standard for reviewing preserved insufficiency claims. While all of the circuits agree that plain-error review applies to unpreserved insufficiency claims, three circuits have stated, at least at times, that application of the plain-error standard has little practical impact because a conviction on constitutionally insufficient evidence will almost always satisfy the third and fourth prongs of the test.[10] Even assuming, however, that the final two prongs of the plain-error analysis are always satisfied when a defendant is convicted on insufficient evidence, prong two—the requirement that the error be plain, clear, or obvious—must be satisfied, and this requirement imposes a greater burden on forfeited claims.[11]

---

[10] *United States v. Flyer*, 633 F.3d 911, 917 (9th Cir. 2011) ("When a conviction is predicated on insufficient evidence, the last two prongs of the [plain-error] test will necessarily be satisfied.") (brackets in original)); *United States v. Duran*, 133 F.3d 1324, 1335 n.9 (10th Cir. 1998) ("[R]eview under the plain error standard . . . and a review of sufficiency of the evidence usually amount to largely the same exercise."); *United States v. Gaydos*, 108 F.3d 505, 509 (3d Cir. 1997) (noting that the last two prongs of plain-error review are always met when the government "fail[s] to prove one of the essential elements of a crime").

[11] It may be that when no reasonable juror could find an element of a crime proved beyond reasonable doubt, it will often be plain or obvious that the evidence was insufficient. In other words, because the normal standard of review is already deferential to the jury verdict, the practical effect of applying a more deferential standard may often be minimal. Still, there will necessarily be some "close calls" on the issue of sufficiency, and the second prong of plain-error review means that close calls must be resolved in favor of the jury verdict.

11

No. 07-41041

It is worth reiterating that the limitations imposed by the plain-error test promote important judicial policies. With respect to unpreserved errors, these limitations serve "to induce the timely raising of claims and objections, which gives the district court the opportunity to consider and resolve them. That court is ordinarily in the best position to determine the relevant facts and adjudicate the dispute." *Id.* at 1428. The contemporaneous-objection rule also "prevents a litigant from 'sandbagging' the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor." *Id.* With respect to unpresented errors, plain-error review ensures that the court is not placed in the position of an advocate scouring the record in search of hidden errors detrimental to one party in the case. The duty to zealously promote a defendant's interests falls to counsel, which preserves the court's role as a neutral adjudicator. Noticing plain errors—errors which are obvious and which counsel and the trial court should have recognized[12]—does not compromise the court's impartiality, because it does not require the court to take up the case with an eye particular to one party's interests.

*2. Analysis*

The record before us is certainly not "devoid of evidence" that Delgado conspired to possess with intent to distribute marijuana. Indeed, viewing "the evidence in the light most favorable to the government, [and] drawing all reasonable inferences and credibility choices made in support of the verdict," *United States v. Ortega Reyna*, 148 F.3d 540, 543 (5th Cir. 1998) (internal quotation marks omitted), the evidence presented at trial was more than sufficient to support Delgado's conspiracy conviction, as it shows that Delgado

_____

As we explain below, the question of the sufficiency of the evidence against Delgado is not close.

[12] We note that an alleged error going unnoticed by the district court, trial counsel, and appellate counsel is typically a good indication that it is not plain.

12

conspired with both her supplier and her intended purchaser in a large-scale drug distribution scheme.

Delgado, borrowing her arguments from the panel majority opinion, now contends that the evidence against her supports only a finding that she was in a mere "buyer-seller" relationship with both her supplier and her intended purchaser. This argument misunderstands the scope of the so-called "buyer-seller exception" in this circuit and ignores substantial evidence. The buyer-seller exception prevents a single buy-sell agreement, which is necessarily reached in every commercial drug transaction, from automatically becoming a conspiracy to distribute drugs. The rule shields mere acquirers and street-level users, who would otherwise be guilty of conspiracy to distribute, from the more severe penalties reserved for distributers. *See United States v. Parker*, 554 F.3d 230, 235–36 (2d Cir. 2009). Thus, "[w]hile it is true that a buyer-seller relationship, *without more*, will not prove a conspiracy, . . . [o]ne becomes a member of a drug conspiracy if he *knowingly participates in a plan to distribute drugs*, whether by buying, selling or otherwise." *United States v. Maseratti*, 1 F.3d 330, 336 (5th Cir. 1993) (emphasis added).

The evidence clearly supports the conclusion that Delgado knowingly participated in a plan to distribute drugs: Vasquez's testimony, which we must credit, described in detail Delgado's plan to transport and resell a quarter-ton of marijuana. Moreover, specific facts support the finding that, rather than acting alone, Delgado worked with a supplier and an intended buyer who shared her intent to distribute the drugs in her possession. With respect to her unnamed supplier, Vasquez testified that after Delgado's intended recipient was arrested, Delgado was going to wait until nighttime to "take that marijuana back to her source of supply." If Delgado had initially obtained the marijuana from her source in a one-time basic buy-sell transaction, she would not have thought she could return $100,000 worth of drugs so easily. The supplier's anticipated

willingness to take the drugs back merely because Delgado's intended plan to resell had fallen through is evidence that Delgado and the supplier were working together with the shared goal of reselling the drugs. Delgado's plan to return the drugs therefore strengthens the more general inference that a dealer in wholesale quantities of drugs, such as Delgado's supplier, is likely to have an interest in his buyers' ability successfully to resell the drugs.[13]

Delgado's argument that return policies are a common feature of many types of retail transaction is beside the point because it fails to recognize that a return policy is a way of encouraging repeat business by providing support to a customer that extends beyond the initial sale. When a wholesaler attempts to cultivate a repeat customer by offering a return policy to a purchaser who he knows will resell the merchandise, the wholesaler takes an interest in the success of the customer's resale business,[14] whether return policies are common or not.[15] Thus, the jury could reasonably conclude, as it did, that Delgado conspired with her supplier.

The government also presented significant evidence that Delgado conspired with her intended recipient in North Carolina. Vasquez testified that Delgado was waiting to be paid by her buyer for the marijuana in advance of

---

[13] *See Parker*, 554 F.3d at 236 ("[I]f we consider a hypothetical seller who is running a profit-motivated business of selling drugs in wholesale amounts, this seller may well realize that his buyers' ability to buy and pay for substantial amounts of drugs, and hence, his profit, will depend on the buyers' ability to resell. The business of selling wholesale quantities depends on the ability of the customers to resell.").

[14] *Id.* at 238–39 ("The more the wholesale seller hopes, in the interest of the success and profitability of his own business, to have a purchaser of wholesale quantities as a regular, repeat customer, the more the seller has an interest and a stake in that purchaser's ability to resell successfully, and consequently the more basis there may be for finding that the seller's supplying of drugs to the buyer to enable the buyer to resell to others may be a conspiracy between the seller and the buyer to bring about those resales.").

[15] We also note our skepticism that drug dealers typically offer return policies to buyers with whom they have no prior relationship.

No. 07-41041

shipment.[16] Receiving fronted money in a drug deal is "'strong evidence' of membership in a conspiracy because it indicates a strong level of trust and an ongoing, mutually dependent relationship." *United States v. Posada-Rios*, 158 F.3d 832, 860 (5th Cir. 1998) (discussing fronting of drugs).

Delgado referred to her intended buyer as "the person who was going to work with her," indicating that their relationship extended beyond one simple buy-sell transaction. Moreover, the quantity of drugs—over 500 pounds—is itself evidence that Delgado was involved in a conspiracy. Though possession of a large quantity of drugs is not, by itself, sufficient to support a conspiracy conviction, it is evidence that can help "justify the inference that more than one person must be involved in moving [the large quantity] toward its ultimate dispersal." *United States v. Barnard*, 553 F.2d 389, 393 (5th Cir. 1977).

For the reasons stated above, we conclude that Delgado's conspiracy conviction was sufficiently supported by the evidence. The record, therefore, was far from "devoid of evidence" of Delgado's guilt. Because the insufficiency argument is unmeritorious, it necessarily follows that the panel majority should not have addressed it, as a court obviously has no reason to raise an issue *sua sponte* only to conclude that it is meritless. The issue was properly subject to the general rule that arguments not raised on appeal are forfeited.

## B. Alleged Trial Errors

---

[16] The following exchange occurred during the government's direct examination of Vasquez:

Q    And she said that she was supposed to be paid money. Tell us about this. What money?

A    The money she was going to be paid, which, in turn, she was going to use to pay us off once the marijuana had been loaded inside the boxes.

Q    So, she hadn't been paid for her part of the marijuana.

A    According to her information, she had not been paid.

Viewing this testimony in the light most favorable to the verdict, as we must, Vasquez confirmed that Delgado was expecting advance payment for the marijuana.

No. 07-41041

In addition to her insufficiency claim, Delgado argues that several trial errors, considered either individually or in the aggregate, require reversal of her convictions. We consider each of her allegations of error individually before examining the applicability of the cumulative error doctrine.

*1. Prosecutorial Misconduct*

Delgado argues that the United States attorney committed reversible misconduct in his closing argument by stating to the jury that Delgado had lied to the ICE agents who discovered the marijuana on her property. In considering whether prosecutorial misconduct warrants reversal, the "determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *United States v. Virgen-Moreno*, 265 F.3d 276, 290 (5th Cir. 2001) (quoting *United States v. Iredia*, 866 F.2d 114, 117 (5th Cir. 1989)).

> This is what the prosecutor said at the end of his closing rebuttal:
>
> Talk about motive to lie, ladies and gentlemen. Who has the motive to lie here? The driver? No. He's working all around. Mr. Vasquez? No. He's in Laredo. He's not a permanent snitch. He's not one of those individuals that makes his living off providing information. He's provided it twice in the past. The agents? You're going to blame the agents for all this? Whose [sic] got the motive to lie here? It's the Defendant, and she's done so. She did so to these agents.

Defense counsel objected to the statement, noting that Delgado "has not testified . . . in this case." The judge sustained the objection. No curative instruction was requested, and none was given *sua sponte*,[17] although the judge

---

[17] *See United States v. Salinas*, 480 F.3d 750, 756 (5th Cir. 2007) ("Salinas never requested that the district court declare a mistrial. Thus, Salinas effectively received all of the relief that he requested from the district court. When a defendant asks this court to reverse a conviction under these circumstances, the defendant essentially asks us 'to go against the implicit judgment of both the trial court and the defendant's trial counsel that the trial court's corrective action was adequate and appropriate.'").

had instructed the jury prior to the closing arguments that the lawyers' statements did not constitute evidence.

The context is crucial to determining the effect of the statement. The defense rested without offering any witnesses. After the judge charged the jury, the prosecutor explained in his initial closing argument how Delgado's conduct met each element of the charged offenses. There were no objections. Defense counsel began his closing by acknowledging that "[t]hings look real bad for Ms. Delgado," but he attempted to paint Delgado as open and straightforward in her dealings with the government agents. He argued that the evidence indicated that Delgado's "demeanor . . . is, come on in. She unlocks everything. She shows them everything. So, nothing she's holding back." Delgado, he contended, "never had any reason not to let them see everything. . . . She didn't hide anything."[18] Defense counsel then shifted to an attack on the credibility of the government's other witnesses. He suggested the possibility that "Mr. Vasquez is controlling" and that Delgado was being set up. He pointed out inconsistencies in Aguilar's statements and hinted that Aguilar should have been considered a suspect.

In his rebuttal, the prosecutor addressed the defense's arguments head-on. He first challenged the assertion that Delgado had been completely forthcoming with the federal agents and then used the majority of his rebuttal to summarize the evidence that Delgado must have had the keys, and therefore control over the tractor trailer, during the time the marijuana was stashed in its cab. His summary, in part, was as follows:

> What do we know? We know this marijuana was found on her property, in her tractor. And yes, she's being cooperative [with the initial search of her property], let them look through the house.

---

[18] In fact, Delgado made the agents wait a considerable amount of time before meeting them at the gate. She then insisted that only three agents be allowed onto the property and locked herself in the house for ten minutes before allowing them to search it. Several government agents testified that her behavior led to concerns about officer safety.

No. 07-41041

> There's nothing in the house. She knows that. . . . But when it comes
> to the tractor trailer, don't know where those keys are. Don't know.
> Must be the driver's. . . . Does it make any sense for the driver to
> have the key? If the driver had the key, how's he going to get the
> tractor out of there? He doesn't have a key to the gate [to Delgado's
> property]. Does that make any sense for the driver to have the keys,
> that he can't get in to the tractor, and if he does get in, he can't get
> out because the gate. That makes no sense. . . . [The driver] took
> [the truck] to Donna[, Texas] to have it fixed, and that's where he
> left it. That was on 9/9; 9/9 he dropped it off. They keys were in the
> truck. . . . He again sees it on 9/13 [when Delgado meets him at the
> mechanic's shop]. Well, how in the world did that tractor get from
> the place in Donna on 9/9 back to her house on 9/11, when the
> agents found all the dope in it? Agents found all the dope on 9/11,
> and then somehow this tractor trailer once again appears on 9/13 at
> the mechanic's store. She had the keys. That's how that happened.
> That's the only way it could happen. There's only one set of keys,
> and she had them.

It was after this explanation that he made the contested statement.

The remark that Delgado had lied was a straightforward comment on the evidence, not an improper assertion of the prosecutor's personal opinion. The evidence showed that Delgado must have had the keys—the natural corollary being that she must have been lying to the federal agents about her access to the cab. In this context, the prosecutor's statement was proper. *Cf. United States v. Loney,* 959 F.2d 1332, 1343 (5th Cir. 1992) ("In his closing argument, the prosecutor . . . told the jury that '[h]e's not being truthful with you.' . . . The prosecutor . . . drew the jury's attention to the fact that [the defendant] had said one thing but his actions showed another. . . . [T]he comments of the prosecutor were entirely appropriate, given the evidence before the jury."). "It is well established that an attorney may recite to the jury those inferences and conclusions he wishes them to draw from the evidence so long as they are based on the evidence." *United States v. Webb*, 950 F.2d 226, 230 (5th Cir. 1991). Moreover, "unflattering characterizations of a defendant will not provoke a

reversal when such descriptions are supported by the evidence." *United States v. Windom*, 510 F.2d 989, 994 (5th Cir. 1975) (finding no error in a prosecutor's reference to a defendant as a "con artist").

A prosecutor may not go beyond the evidence and attack a defendant's character or veracity. *See United States v. Anchondo-Sandoval*, 910 F.2d 1234, 1237–38 (5th Cir. 1990). But reciting the conclusion that the defendant lied on a particular occasion is not, as Delgado contends, equivalent to calling the defendant a liar. Here, the prosecutor's statement was an inference drawn from specific evidence, not an attack on Delgado's character.

The prohibition on giving personal opinions prevents a prosecutor from giving the jury the impression that he has superior knowledge of the facts based on private information not admitted into evidence. *See United States v. Morris*, 568 F.2d 396, 401 (5th Cir. 1978). Thus, the Supreme Court has stated that "assertions of personal knowledge are [especially] apt to carry much weight against the accused when they should properly carry none." *Berger v. United States*, 295 U.S. 78, 88 (1935). Improper assertion of a prosecutor's personal opinion "is easily recognized." BENNET L. GERSHMAN, PROSECUTORIAL MISCONDUCT § 11:24 (2d ed. 2010). Unlike the statement at issue here, "[i]t includes personal expressions such as 'I think,' 'I know,' 'I believe,' or other expressions that either explicitly or implicitly convey the prosecutor's personal impressions." *Id.* Contrary to Delgado's suggestion, the contested statement included no indication that the prosecutor was trying to sway the jury by stating his personal opinion, and it certainly did not imply that he was relying on information that was not admitted into evidence. While the prosecutor should have chosen his words more carefully, his argument differs from improper argument in that its meaning and effect would have been no different had he simply added the words "As I've explained, the evidence shows" before stating that Delgado had lied.

No. 07-41041

Moreover, even if the comment was inappropriate, it certainly does not merit reversal of Delgado's convictions.[19] A criminal defendant seeking a reversal of his conviction for prosecutorial misconduct "bears a substantial burden," *Virgen-Moreno*, 265 F.3d at 290, which is why we have refused to reverse even when improper arguments were admittedly inflammatory. *See, e.g.*, *Anchondo-Sandoval*, 910 F.2d at 1237 (affirming conviction despite prosecutor stating, "I am going to tell you my feelings in this case—the defendant in this case is one of the most artful liars I have ever met"); *United States v. Fields*, 483 F.3d 313, 360 (5th Cir. 2007) (holding that defendant's substantial rights were not affected when the prosecutor referred to him as a "psychopath" during closing argument); *United States v. Iredia*, 866 F.2d 114, 117 (5th Cir. 1989) (no reversible error where "prosecutor accused [defendant] of intentionally disguising his handwriting while giving an exemplar").

Overturning a jury verdict for prosecutorial misconduct is appropriate only when, "taken as a whole in the context of the entire case," the prosecutor's comments "prejudicially affect[ed the] substantial rights of the defendant." *United States v. Risi*, 603 F.2d 1193, 1196 (5th Cir. 1979). In determining whether the defendant's substantial rights were affected, we consider three factors: "(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction." *United States v. Wyly*, 193 F.3d 289, 299 (5th Cir. 1999) (internal quotation marks omitted). "If the evidence to support a conviction is strong, then it is unlikely that the defendant was prejudiced by improper arguments of the prosecutor and reversal is not required." *United States v. Casel*, 995 F.2d 1299, 1308 (5th Cir. 1993), *vacated*

---

[19] The conclusion that the prosecutor's statement was harmless is bolstered by the fact that Delgado's trial counsel did not request a curative instruction.

*on other grounds as to one defendant sub nom. Reed v. United States*, 510 U.S. 1188 (1994).

The contested statement was weakly prejudicial, if at all. The statement was strongly supported by the evidence presented, making it unlikely that the jury relied on the prosecutor's statement to reach the conclusion that Delgado had lied about her access to the tractor-trailer. Any prejudice is further limited because, as demonstrated above, the prosecutor's comment neither attacked Delgado's general character nor hinted that he was relating private information confirming Delgado's guilt. Moreover, the alleged misconduct was limited to one brief statement. "A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone," *United States v. Neal*, 27 F.3d 1035, 1051 (5th Cir. 1994), and a single statement at closing will rarely justify reversal:

> We must view the prosecutor's statement in light of [the] entire trial . . . . [W]hile the prosecutor may have accused [the defendant] of lying, these comments were neither persistent nor pronounced when considered within the context of the entire closing argument, and they did not violate his substantive rights.

*Bradford v. Whitley*, 953 F.2d 1008, 1013 (5th Cir. 1992) (internal quotation marks and citations omitted); *see also Wyly*, 193 F.3d at 299 ("For prosecutorial misconduct to warrant a new trial, it must be so pronounced and persistent that it permeates the entire atmosphere of the trial."). Obviously the statement at issue here, a single line from a closing argument spanning fifteen transcript pages, was neither "persistent nor pronounced."

Turning to the second factor, where no cautionary instruction is requested, the lack of a *sua sponte* instruction counts neither in favor of nor against reversal. *See United States v. Sanchez*, 961 F.2d 1169, 1176 (5th Cir. 1992). The third factor—the strength of the evidence against Delgado—clearly weighs against reversal. Specifically as to the knowledge element of the charged

offenses, the government presented overwhelming evidence: Vasquez's testimony, which we must credit, provided extensive direct evidence of Delgado's knowledge that was corroborated by virtually every type of circumstantial evidence, including the uncontradicted evidence that the truck was under Delgado's exclusive control when it was loaded with more than 500 pounds of marijuana. Weighing each of the three factors, then, it is apparent that Delgado's substantial rights were not affected; the prosecutor's comment, which was closely supported by the evidence, did not "cast serious doubt" on the jury's guilty verdict. *Virgen-Moreno*, 265 F.3d at 290. The prosecutor's statement did not constitute error, and certainly did not meet the high bar that would necessitate a reversal of Delgado's convictions.

### 2. Failure to Declare Mistrial

Delgado also argues that her trial was rendered unfair by the testimony of the government's case agent, Agent Spivey of ICE. On cross-examination, Delgado's trial counsel inquired into the scope of the government's investigation. Defense counsel first asked Spivey about the initial search of Delgado's property on September 11, 2006, when the marijuana was discovered and seized. Counsel then began questioning Spivey about the government's subsequent investigation, particularly the seizure of additional items from Delgado's property a month later on October 11. After Spivey testified that these seized items yielded no useful evidence, the following exchange ensued:

Q    Did you all try to investigate [Delgado's] income to see, you know, how much money she makes . . . or—

A    No, sir.

Q    Did you all investigate I believe it was TJ Trucking?[20]

---

[20] This exchange occurred after the jury had already heard testimony that Delgado was the sole owner-operator of TJ Trucking.

22

No. 07-41041

A     We had prior knowledge of TJ Trucking being involved in narcotics trafficking, yes.

Defense counsel then moved to strike Spivey's last response, and following a bench conference moved for a mistrial. The district court sustained the objection and thoroughly instructed the jury to disregard the statement.[21] The district court concluded that the "prejudicial effect outweighs the probative value of that answer," but he denied the defense's motion for a mistrial because "[t]he question was asked by you [defense counsel]. I think it was fairly invited, that answer."

On appeal, Delgado argues that Spivey's answer was inadmissable under Federal Rule of Evidence 404(b) as evidence of an extraneous offense. This argument is unconvincing. Spivey's statement did not refer to an extraneous offense. Delgado was the sole owner and operator of TJ Trucking. Thus, Spivey's statement that TJ Trucking was involved in drug trafficking merely restates that Delgado was involved, so the statement was simply evidence of the charged offense. Delgado contends that Spivey's reference to "prior knowledge" indicates that he was commenting on a separate investigation of a previous offense. But this is hardly clear from the context. Spivey's comment came during a line of questions regarding his *subsequent* investigation of Delgado a month after the initial search of her property. In that context, the statement that Spivey had "prior knowledge" of TJ Trucking's involvement in drug trafficking likely referred to the fact that during the initial search, agents had found a large shipment of marijuana in TJ Trucking's truck. Delgado responds that she and her trucking company were implicated in a separate investigation and that Spivey's comment was based on his knowledge of that separate offense. Even if

---

[21] "Members of the jury, I'm going to ask you to strike and disregard that last answer that was given. It's to have no role in your deliberations whatsoever. You're to pretend as though you didn't hear that. Disregard it completely."

No. 07-41041

Delgado's interpretation of the testimony is correct, however, Spivey's meaning would not have been appreciated by the jurors, who were unaware of the other investigation. The statement itself, without elaboration, gave no indication to the jury that it was about any crime other than those for which Delgado was being tried.

Moreover, as the district court correctly concluded, Agent Spivey's testimony was invited by defense counsel's question. We agree with the prosecutor's observation, made during the bench conference, that defense counsel "asked the question open-ended and did not know the answer, and that was the answer."[22] "The doctrine of invited error applies to this situation; when injection of inadmissible evidence is attributable to the actions of the defense, the defense cannot later object to such 'invited error.'" *United States v. Raymer*, 876 F.2d 383, 388 (5th Cir. 1989); see also *United States v. Lewis*, 524 F.2d 991, 992 (5th Cir. 1975) ("A defendant cannot complain on appeal of alleged errors invited or induced by himself, particularly where, as here, it is not clear that the defendant was prejudiced thereby."). Thus, Delgado could not prevail on her appeal even if the district court had admitted the contested testimony. But crucially, the district court upheld defense counsel's objection, and gave a strong curative instruction to the jury, so Delgado cannot claim evidentiary error. Thus, Delgado's only argument on appeal is that the district court abused its discretion in denying her motion for a mistrial.

When denying a motion for a mistrial, the district court abuses its discretion, giving rise to reversible error, only "if the evidence, when viewed in the context of the whole trial, is so highly prejudicial that it would have had a

---

[22] Defense counsel was aware that Delgado's company was implicated in a separate drug-trafficking investigation, which was the subject of a pretrial motion in limine. If anything, this fact reinforces our conclusion that Spivey's testimony was invited. Counsel should have been aware that he risked opening the door to a prejudicial answer, yet he posed a somewhat vague and open-ended question to a prosecution witness.

24

substantial impact on the jurors' verdict." *United States v. Baresh*, 790 F.2d 392, 402 (5th Cir. 1986). Spivey's statement falls well short of the level of prejudice that would have necessitated a mistrial. As explained above, heard in context, his testimony did little more than repeat a fact of which the jury was already well aware: the government believed Delgado was involved in drug trafficking. Moreover, any prejudice was mitigated by the district court's prompt and thorough curative instruction. *See United States v. Kimble*, 719 F.2d 1253, 1258 (5th Cir. 1983) ("We are satisfied that the error inherent was mitigated and rendered harmless by the trial judge's prompt curative instruction."). The district court obviously did not abuse its discretion in refusing to declare a mistrial. We therefore reject Delgado's allegation of error.

*3. Deliberate Ignorance Instruction*

Delgado next alleges that the district court erred by giving a deliberate ignorance jury instruction.[23] Proving "deliberate ignorance" is one way for the government to satisfy the knowledge requirement of 21 U.S.C. § 841(a)(1). *See United States v. Lara-Velasquez*, 919 F.2d 946, 951 (5th Cir. 1990). "The term deliberate ignorance 'denotes a conscious effort to avoid positive knowledge of a fact which is an element of an offense charged, the defendant choosing to remain ignorant so he can plead lack of positive knowledge in the event he should be caught.'" *Id.* (quoting *United States v. Restrepo-Granda*, 575 F.2d 524, 528 (5th Cir. 1978)). In order to avoid the risk of confusing the jury as to the government's burden on the knowledge element, a deliberate ignorance instruction should be

---

[23] The district court instructed the jury as follows:
You may find that the Defendant had knowledge of a fact if you find that the Defendant deliberately closed her eyes to what would otherwise have been obvious to her. While knowledge on the part of the Defendant cannot be established merely by demonstrating that the Defendant was negligent, careless, or foolish, knowledge can be inferred if the Defendant deliberately blinded herself to the existence of a fact.

No. 07-41041

given only when the government presents evidence of the defendant's "(1) subjective awareness of a high probability of the existence of illegal conduct and (2) purposeful contrivance to avoid learning of the illegal conduct." *United States v. Threadgill*, 172 F.3d 357, 368 (5th Cir. 1999). Delgado made no objection to the instruction given below, so it must be reviewed for plain error.[24]

Assuming *arguendo* that the instruction was not appropriate, Delgado cannot show that the error affected her substantial rights. Under well-established precedent, the error in giving a deliberate ignorance instruction in the absence of evidence of contrivance is "'harmless where there is substantial evidence of actual knowledge.'" *Id.* at 369 (quoting *United States v. Cartwright*, 6 F.3d 294, 301 (5th Cir. 1993)). As described above, the government put on substantial evidence of Delgado's actual knowledge, so Delgado could not have been prejudiced by the challenged instruction. This alleged error provides no grounds for a reversal of Delgado's convictions.

*4. Buyer-Seller Instruction*

In connection with her argument, addressed above, that the evidence was insufficient to support her conspiracy conviction, Delgado argues that the district court erred in failing to instruct the jury that a buyer-seller relationship alone does not constitute a conspiracy. Again, this objection was not raised below and

---

[24] The panel majority failed to apply the plain-error test, despite Delgado's concession that plain error was the appropriate standard of review. *Delgado*, 631 F.3d at 706–09. This failure was significant because unpreserved errors that are not plain have no place in a cumulative error analysis. Although we have recognized that, at least in theory, obvious unpreserved errors which do not *individually* require reversal may contribute to a cumulative error holding, *see United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998), plain-error analysis under Rule 52(b) prohibits us from basing a reversal on unpreserved errors that are not "plain" under the second prong of plain-error review. All four prongs of the test must be satisfied in order for us to correct an error. It is logical that certain errors may affect substantial rights or threaten "the fairness, integrity or public reputation of judicial proceedings"—prongs three and four—only when considered together with other errors, but cumulation can never satisfy Rule 52(b)'s further requirement that an error must be "plain" before it may be "noticed." Thus, at the very least, errors subject to plain-error review must be plain or obvious before they may form the basis of a plain-error reversal.

26

No. 07-41041

must therefore be reviewed only for plain error.[25] But Delgado concedes that it is not error, at least in this circuit, to forego a buyer-seller instruction if the jury is otherwise correctly instructed on the law of conspiracy. *United States v. Mata*, 491 F.3d 237, 241 (5th Cir. 2007).[26] The district court's conspiracy instructions were more than adequate. Additionally, and most importantly, a buyer-seller instruction would not have been appropriate here because, as explained above, the evidence went well beyond a buyer-seller relationship.

   *5.* Sears *Instruction*

Delgado also contends that the district court erred by failing to give a *Sears* instruction on the conspiracy charge. In *Sears v. United States*, a panel of this court held that in appropriate circumstances the district court should instruct the jury that an "agreement" with a government agent cannot be the basis for a conspiracy conviction because a government agent does not share the accused's criminal purpose. 343 F.2d 139, 142 (5th Cir. 1965) ("[A]s it takes two to conspire, there can be no indictable conspiracy with a government informer who secretly intends to frustrate the conspiracy."). On appeal, Delgado argues that the evidence showed that she had attempted to conspire only with Vasquez, the informant, and that a *Sears* instruction was therefore required.

We first note that Delgado neither requested, nor objected to the absence of, a *Sears* instruction at trial.[27] "[T]he usual rule is that the failure of the district court to afford an instruction to the jury cannot be complained of on appeal in the absence of request or objection by counsel in the trial court."

---

[25] The panel majority's discussion failed to mention the applicable standard of review. *Delgado*, 631 F.3d at 709–10.

[26] In her en banc brief, Delgado invites us to reconsider circuit precedent and impose the requirement that a buyer-seller instruction be given when the evidence provides an appropriate factual basis. We decline this invitation.

[27] Delgado's failure to request the special instruction at trial is one of several significant facts that distinguish her case from *Sears*.

27

No. 07-41041

*United States v. Jones*, 673 F.2d 115, 118 (5th Cir. 1982). Our review is only for plain error, so Delgado must demonstrate a plain error that affected her substantial rights before we even have discretion to reverse her conviction. On plain-error review, unpreserved challenges to omitted jury instructions are reversible "only in egregious instances." *United States v. Arky*, 938 F.2d 579, 582 (5th Cir. 1991).

Although a *Sears* instruction would have been appropriate because Delgado's co-conspirators were unnamed, and a substantial amount of the testimony against Delgado came from a government informant, several considerations make it clear that the instruction's omission was not reversible error.[28] First, the evidence of true co-conspirators is more substantial here than in *Sears*. The need for a *Sears* instruction is inversely related to the strength of the evidence that the defendant entered an agreement with actual co-conspirators, not just government agents. Where the evidence clearly establishes that the defendant conspired with non-governmental participants, the mere fact a government agent was also involved in the scheme does not necessitate a *Sears* instruction. *See United States v. Slaughter*, 238 F.3d 580, 585 (5th Cir. 2000). In *Sears*, "[t]here was no evidence that [the defendant] ever had any contact with [his alleged co-conspirators] or that he even knew they were assisting [the government agent] in the [illegal] operation." 343 F.2d at 141. Moreover, it was undisputed that the government agent approached the defendant to propose an illegal scheme and that the government agent, acting alone, enlisted the help of the defendant's alleged co-conspirators. Thus, "[i]n view of the posture of the evidence," we concluded that a specific cautionary instruction was required. Delgado, on the other hand, was already involved in a conspiracy to transport

---

[28] The omission of an appropriate jury instruction is not necessarily error. *See Jones*, 673 F.2d at 119 ("better practice" is to caution juries against relying too heavily on accomplice testimony, but failure to warn is not necessarily error).

28

No. 07-41041

drugs when she approached Vasquez for assistance, making this case more analogous to *Slaughter* than to *Sears*. In *Slaughter*, we held that the trial court had not erred by failing to give an unrequested *Sears* instruction because the government had "presented evidence at trial to establish a conspiracy existed which included [the defendant] and five others who were not government agents or informants." 238 F.3d at 585. Similarly, as discussed above, the evidence against Delgado established the existence of two co-conspirators apart from the informant.

Second, the government never asserted that Delgado had conspired with Vasquez. "[W]e review claimed deficiencies in a jury charge by looking to the entire charge as well as the arguments made to the jury." *United States v. Tovias-Marroquin*, 218 F.3d 455, 457 (5th Cir. 2000) (quoting *United States v. Chagra*, 807 F.2d 398, 402 (5th Cir. 1986)). The government argued at closing that Delgado had conspired with her supplier and her intended purchaser.[29]

Third, although the district court did not explicitly instruct the jury that an apparent agreement with a government informant cannot constitute a conspiracy, the instructions given by the court effectively minimized the risk that the jury would confusedly consider Vasquez a co-conspirator. In addition to other accurate instructions on the law of conspiracy, the written jury charge included the instruction that a conspiracy "is a kind of 'partnership in crime' in which each member becomes the agent of every other member." It was abundantly clear from the evidence that Vasquez, who never had the requisite intent to further the conspiracy, was not Delgado's "partner in crime." In light of the significant evidence of proper co-conspirators, the government's closing argument, and the particular instructions given by the district court, we

---

[29] In describing how the elements of conspiracy were satisfied, the prosecutor stated, "[T]he Defendant got the marijuana from somebody, and she was supposed to deliver it to her person in North Carolina. That's three people right there."

conclude that the district court did not err by failing to give a *Sears* instruction *sua sponte*.

It is worth noting that even on the assumption the district court erred, Delgado could not come close to demonstrating reversible plain error. The "failure to give an . . . instruction [*sua sponte*] is not plain error simply because, if requested, the district court's failure to do so would have been reversible." *Jones*, 673 F.2d at 119. Importantly, Delgado never advanced the defense that she conspired only with a government agent; presumably as a strategic trial decision, she based her defense solely on the knowledge element. Thus, the lack of a *Sears* instruction did not impede her defense. As the Ninth Circuit has held in similar cases, "[w]here a defendant does not offer a particular instruction, and does not rely on the theory of defense embodied in that instruction at trial, the district court's failure to offer an instruction on that theory *sua sponte* is not plain error." *United States v. Montgomery*, 150 F.3d 983, 996 (9th Cir. 1998); *accord United States v. Romero*, 282 F.3d 683, 689 (9th Cir. 2002). Now that her chosen defense strategy has failed, Delgado should not be afforded an opportunity to advance alternative, forgone defenses. The argument that she was entitled to a *Sears* instruction is unpersuasive, and in any event it is forfeited and she cannot demonstrate plain error. This alleged point of error provides no grounds for reversal.

*6. Transcript Omissions*

Delgado finally argues that omissions in the trial transcript violate the Court Reporter Act, 28 U.S.C. § 753(b), and necessitate a new trial. There is little need to address this argument at length. To be entitled to a reversal of her convictions, Delgado must demonstrate that a "substantial and significant portion of the record" is missing. *United States v. Selva*, 559 F.2d 1303, 1306 (5th Cir. 1977). Although Delgado points to numerous ellipses in the trial transcript, her appellate counsel admitted at argument that the omissions include only

No. 07-41041

those brief interludes during which the speakers' voices were inaudible or otherwise unintelligible.[30]

Our cases make clear that a gapless transcription of a trial is not required. We have not found reversible error even when a transcript was missing seventy-two bench conferences. *United States v. Gieger*, 190 F.3d 661, 667 (5th Cir. 1999); *see also United States v. Aubin*, 87 F.3d 141, 149–50 (5th Cir. 1996) (holding that failure to transcribe nine bench conferences did not constitute reversible error). All of Delgado's objections and all of the district court's rulings are on the record. Delgado has not demonstrated that any of the short omissions in the transcript were "significant" or "substantial" as required by our precedents.

*7. Cumulative Error Analysis*

Delgado additionally argues that several alleged trial errors, discussed individually above, when considered cumulatively, require reversal of her convictions. "[T]he cumulative error doctrine . . . provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *Munoz*, 150 F.3d at 418. The cumulative error doctrine has no applicability to Delgado's trial.

"Cumulative error" justifies reversal only when errors "so fatally infect the trial that they violated the trial's fundamental fairness." *Fields*, 483 F.3d at 362.[31] We have repeatedly emphasized that the cumulative error doctrine

---

[30] A full audio recording of her trial was available to Delgado on appeal, but Delgado contends that it too was inadequate.

[31] *United States v. Riddle*, 103 F.3d 423 (5th Cir. 1997), one of our most recent cumulative-error reversals, is illustrative of the height of the bar for reversing a conviction on cumulative error grounds. In that case, the district court improperly admitted two and a half days of expert prosecution testimony, erroneously prevented the defense expert from testifying, admitted six documents containing hearsay, and allowed testimony about other crimes for which the defendant was not on trial.

necessitates reversal only in rare instances[32] and have previously stated en banc that "the possibility of cumulative error is often acknowledged but practically never found persuasive." *Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir. 1992) (en banc). Its application is especially uncommon where, as here, the government presents substantial evidence of guilt.[33] The doctrine justifies reversal only in the unusual case in which synergistic or repetitive error violates the defendant's constitutional right to a fair trial. That did not happen here.

Delgado has, at most, demonstrated one possible harmless error—the deliberate ignorance instruction. As discussed above, this error clearly does not merit the reversal of Delgado's convictions. Because we have rejected her other allegations of error, and non-errors have no weight in a cumulative error analysis, there is nothing to accumulate.[34] Thus, the cumulative error doctrine has no applicability to Delgado's allegations of error.

## C. Sentence Enhancement

The district court applied a two-level enhancement to Delgado's sentence for her role in the offense pursuant to section 3B1.1(c) of the United States Sentencing Guidelines, which increased her sentencing range from 78–97 to

---

[32] *See, e.g.*, *United States v. Villarreal*, 324 F.3d 319, 328 (5th Cir. 2003) ("We have stressed, however, that a reversal based on the cumulative effect of several alleged errors is a rarity."); *United States v. Reedy*, 304 F.3d 358, 373 (5th Cir. 2002) (same); *United States v. Wicker*, 933 F.2d 284, 292 (5th Cir. 1991) (same); *United States v. Lindell*, 881 F.2d 1313, 1327 (5th Cir. 1989) (same); *Iredia*, 866 F.2d at 118 (same). In the past 35 years, this court has reversed a conviction for cumulative error in only four published opinions. *United States v. Johnston*, 127 F.3d 380 (5th Cir. 1997); *Riddle*, 103 F.3d at 435 (5th Cir. 1997); *United States v. Labarbera*, 581 F.2d 107, 110 (5th Cir. 1978); *United States v. Diharce-Estrada*, 526 F.2d 637, 642 (5th Cir. 1976).

[33] *See Neal*, 27 F.3d at 1052 ("[W]e are not persuaded, in light of the substantial evidence of guilt adduced at trial, that the Defendants are entitled to reversal on the basis of cumulative error.").

[34] *See Fields*, 483 F.3d at 362 ("Many of Fields's claims do not amount to error at all."); *see also United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990) ("[W]e therefore hold that a cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors.").

No. 07-41041

97–121 months. Delgado was sentenced to 100 months of imprisonment. She challenges the district court's determination that she played a leadership or managerial role in the drug ring. The district court's factual findings at sentencing are reviewed for clear error. *United States v. Zuniga-Peralta*, 442 F.3d 345, 347 (5th Cir. 2006).

Section 3B1.1(c) provides that the enhancement is appropriate where "the defendant was an organizer, leader, manager, or supervisor in any criminal activity." The application notes to section 3B1.1 require that the defendant either (1) exercised control over another participant in the offense, or (2) "exercised management responsibility over the property, assets, or activities of a criminal organization." U.S.S.G. § 3B1.1, cmt. n.2. The district court adopted the PSR's enhancement recommendation over Delgado's objection, stating that "she seemed to have a pretty organizational type role, kind of managing this transportation ring."

The district court's factual finding that Delgado exercised management responsibility over the property and activities of a drug trafficking ring is not clearly erroneous. She exercised control over a large quantity of drugs and the truck used to transport them. The evidence also shows that she made arrangements for their transportation and delivery.

## III. CONCLUSION

For the reasons stated above, Delgado's convictions and sentence are AFFIRMED.


HAYNES, Circuit Judge, concurs in the judgment only.

33

No. 07-41041

DENNIS, Circuit Judge, joined by WIENER, Circuit Judge, dissenting.

In failing to reverse Maria Delgado's conspiracy conviction, the majority opinion commits two major errors: First, it perpetuates the erroneous "no evidence" or "devoid of evidence" standard of review for forfeited due process sufficiency-of-the-evidence claims, thus missing this en banc opportunity to join our sister circuits as a majority in recognizing that after *Jackson v. Virginia*, 443 U.S. 307 (1979), the Due Process Clause, *United States v. Olano*, 507 U.S. 725 (1993), and Federal Rule of Criminal Procedure 52(b), require appellate courts to review plain insufficiency-of-the-evidence errors even if they have been forfeited on appeal. Second, although the majority opinion ties all future oral argument panels to the erroneous "devoid of evidence" standard, it purports to charitably review Delgado's conspiracy conviction under the correct *Jackson v Virginia* standard, but misapplies the standard here and reaches the wrong result. Ironically, the en banc majority confuses its own suspicion, speculation, and fiction for real evidence and fails to recognize that the evidence of a true conspiratorial agreement between Delgado and a bona fide co-conspirator is so lacking that Delgado's conspiracy conviction should be reversed under either the correct *Jackson v. Virginia* standard or the obsolete and erroneous "no evidence" standard. Therefore, I respectfully dissent.[1]

This opinion discusses the conspiracy charge in this case and the evidence adduced at trial by the government; the fundamental due process principles to which all of our decisions must adhere, and the correct *Jackson v. Virginia* standard for reviewing Delgado's forfeited insufficiency-of-evidence claim; the reasons that the majority's perpetuation of the "no evidence" or "devoid of

---

[1] For the reasons explained in the panel majority opinion,"[t]he cumulative impact of [numerous] significant errors, together with the jury's false belief that Delgado had committed the conspiracy offense, clearly deprived her of her right to a fundamentally fair trial on the charge of possession with intent to distribute marijuana." *United States v. Delgado*, 631 F.3d 685, 698-711 (5th Cir. 2011).

34

No. 07-41041

evidence" standard is a grievous error that will harmfully affect the work of our oral argument panels; and finally, the reasons that the evidence here is clearly insufficient under *Jackson v. Virginia* to prove an agreement between Delgado and any other bona fide conspirator to possess drugs with the further intent to distribute them.

## I. Background

### A. Conspiracy charge

The first count of the indictment charged Delgado with "knowingly and intentionally conspir[ing] and agree[ing] with other person or persons . . . to knowingly and intentionally *possess with intent to distribute* a controlled substance," in violation of 21 U.S.C. §§ 841(a)(1) and 846. (emphasis added).[2] Section 846 criminalizes, among other things, "conspir[acy] to commit any offense defined in this subchapter"; and § 841(a)(1) proscribes several acts: "[I]t shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ." Delgado was charged with conspiring to "possess with intent to distribute a controlled substance." Therefore, the Government had to prove beyond a reasonable doubt that Delgado entered into an agreement with another person not just to possess a controlled substance, but to possess the substance "with the intent to distribute" it. This agreement is referred to herein as "a drug distribution agreement."

---

[2] See also the jury instructions: "For you to find the Defendant guilty of [conspiracy], you must be convinced that the Government has proved . . . beyond a reasonable doubt [inter alia] . . . that two or more persons, directly or indirectly, reached an agreement *to possess with the intent to distribute* a controlled substance." (emphasis added).

No. 07-41041

**B.     Trial evidence**

The Government's case rested largely on the testimony of a paid Government informer, Bartolome Vasquez. Vasquez testified that he had known and done legitimate business with Delgado for almost four years, during which time he worked for a produce broker and shipper in Laredo, Texas, and assembled shipments of produce from Mexico to be hauled by Delgado's company, TJ Trucking. Vasquez testified that on September 8, 2006, Delgado abruptly offered to pay him $10,000 to commingle bundles of marijuana in a TJ Trucking shipment of broccoli bound for New York, and to arrange for the marijuana to be delivered to a buyer in North Carolina. Vasquez testified that he initially refused and reported the incident to Immigration and Customs Enforcement (ICE) officers in Laredo. He knew they might reward such information because ICE had paid him for such information on two prior occasions. Indeed, Vasquez was handsomely rewarded: he received $7,500 for his information and efforts to incriminate Delgado.

Vasquez testified that at the instruction of ICE officers, he contacted Delgado, withdrew his initial refusal, and purported to agree to make arrangements for the concealed drug shipment. Secretly working with ICE officers, Vasquez recorded several of his phone conversations with Delgado, which were in Spanish and appeared to be nothing more than discussions about the arrangements for a regular produce shipment. However, according to Vasquez, the conversations were in code and were really about the proposed marijuana shipment. Vasquez and the ICE officers planned to have Delgado send the truck containing the marijuana to rendezvous with Vasquez on September 11, 2006, at a Government-controlled warehouse in Laredo, where the officers would make arrests and seize the drugs. However, on September 11, Delgado called Vasquez and said that the shipment was cancelled because the buyer in North Carolina had been arrested. Vasquez relayed this information

36

to the ICE officers, and told them that the rig with the marijuana was parked at Delgado's house.  According to Vasquez, Delgado had said that she planned to try to return the marijuana, but did not say how, where, or to whom.

Later that day, ICE officers went to Delgado's house near Weslaco, Texas. They could see the truck described by Vasquez parked inside the locked fence around Delgado's property.  After the officers alerted Delgado to their presence, she came out and met them at the gate and agreed to allow them to search her home and the truck.  She voluntarily opened a closet and safe in her house where the officers found three handguns and a shotgun; however, she told the officers that she did not have a key to the truck, that only the driver had the key, and that she did not have his phone number.  With Delgado's permission, an officer used a coat hanger to unlock the cab door of the truck and discovered 230 kilograms of marijuana in the truck's sleeper compartment.  Delgado denied knowing that the drugs were in the truck and told the officers that the driver, who had parked and locked the truck, must have left the marijuana inside.  In a room of Delgado's house, another officer found a trash bag with a number of aluminum wrappers containing what the officer believed was marijuana residue. Delgado told the officers that she thought the wrappers had held potting soil and that her house and garden worker, Peter (or Pedro), had brought them in.

Albert Aguilar, who lived in Weslaco near Delgado's house and had worked as a driver for TJ Trucking for some ten months before the ICE officers seized the rig, testified that he was the only driver operating the truck during that period.  He denied having any knowledge of contraband or drug activity involving the truck. He testified that he drove loads of produce for Delgado and TJ Trucking almost weekly from Laredo to points throughout the United States. He said that between trips he always parked the truck at Delgado's house, locked the cab, and left the key with Delgado.  He said he knew of only one key to the truck.

No. 07-41041

Regarding the week before the officers' September 11, 2006, discovery of marijuana in the truck, Aguilar testified that he picked up a load of pork in Omaha, Nebraska, and headed back to Texas. On September 7, he arrived in Weslaco, parked the truck at Delgado's house, locked the cab, left the key with Delgado, and went home. On September 8, he picked up the truck at Delgado's house and drove the load of pork to Hidalgo, Texas, where the pork was unloaded. Aguilar then went to Edinburg, Texas, to drop off the bill of lading; and from there, he took the truck to a mechanic's shop in Donna, Texas, where he left the truck and the key. He testified that at that time there was no marijuana in the vehicle. There was no evidence introduced at trial tracing the truck's movements or its contents between the time Aguilar left the truck in Donna, Texas, on September 8, and September 11, when the marijuana was discovered in it. Nor was there any evidence as to the number or identity of the other persons who had access to the truck during that interval. On September 13, Delgado called Aguilar and told him about the officers' search of the truck two days before, assured him the truck was now "clean," and asked him to pick up a new load in Laredo. Delgado met Aguilar with the truck at a tire shop where they put air into the tires, and he drove the truck to Laredo, where it was seized by ICE officers.

The Government did not introduce any evidence that tied Delgado to the marijuana found in the truck. A chemist's test, introduced by stipulation, determined that the bundles found in the truck were marijuana; however, no such test was introduced to identify the residue in the aluminum wrappers found in Delgado's house or to link the wrappers to the marijuana found in the truck. Although the officers seized Delgado's cell phone, computer, a camera, and her business, financial, and banking records, the Government found no evidence of illegal drug activity among those items. And although officers testified that they had located Peter, Delgado's house and garden worker, and

38

one officer reported seeing Delgado's ex-husband at her house on a later date, neither of these potential witnesses testified at trial. The Government introduced no testimony regarding whether other persons were involved with Delgado in the TJ Trucking business, whether other members of her family resided in her house, or who was the registered owner of the truck. There was also no evidence of Delgado's fingerprints on the aluminum wrappers, the bundles of marijuana, or the sleeper cab of the truck.

The Government introduced no evidence identifying the supplier of the marijuana. Indeed, the Government offered no evidence whatsoever regarding the origin of the marijuana found in the truck. Neither did the Government introduce any evidence identifying the prospective, North Carolina buyer—despite the fact that Vasquez testified that the person had been arrested in McAllen, Texas, in the Rio Grande Valley. Nor was there evidence of any discussion between Delgado and the supplier or the putative buyer, or of the nature or extent of Delgado's relationship, if any, with either of them.

## II.    Standard of review for sufficiency of the evidence

At the close of the Government's case, Delgado moved for acquittal on the grounds that the evidence did not sufficiently prove that she knowingly possessed the marijuana found in the truck on her property. In response, the district court said, "The Court notes your motion, but it's denied at this time. And the Court finds there's some evidence, substantial evidence, or some evidence to support each of the counts alleged in the Indictment." That is, the district court considered whether the evidence was sufficient to prove the conspiracy count; and although the court seemingly applied the wrong standard ("some evidence" as opposed to "sufficient evidence"), it held that the evidence was not insufficient. It was proper for the district court to consider this issue

sua sponte, according to Rule 29 of the Federal Rules of Criminal Procedure, which provides:

> After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. *The court may on its own consider whether the evidence is insufficient to sustain a conviction.*

Fed. R. Crim. P. 29 (emphasis added). Although Delgado did not object to the court's ruling that the evidence was sufficient, she did not need to take an exception to the court's ruling to preserve the issue. *See* Fed. R. Crim P. 51(a) ("Exceptions to rulings or orders of the court are unnecessary.").[3] Nonetheless, Delgado did not argue that the evidence was insufficient in her appellate briefs to this court and thus, she forfeited the issue on appeal. *See Olano*, 507 U.S. at 733 ("forfeiture is the failure to make the timely assertion of a right"). Therefore, we must first decide what standard governs our review of a forfeited insufficiency-of-the-evidence claim.

## A.　Due process principles and the correct standard for review of a forfeited insufficiency-of-evidence claim

The correct standard for appellate review of a forfeited insufficiency-of-the-evidence claim is understood within the context of fundamental due process principles. The Supreme Court has always considered proof beyond a reasonable

---

[3] *See also United States v. Pennington*, 20 F.3d 593, 597 n.2 (5th Cir. 1994) ("[W]here the trial court's action renders the motion for acquittal 'an empty ritual,' the failure to renew the motion does not constitute waiver by the defendant. The district court stated, 'I can't find anything in this case that would warrant this Court granting a new trial or a motion for acquittal.' Thus, since here the defendants' motions would have been empty rituals, . . . the only question is whether there was sufficient evidence for a rational jury to have convicted them." (citation omitted)); *United States v. Gonzalez*, 700 F.2d 196, 203 n.6 (5th Cir. 1983) ("At the close of the evidence, the court moved with dispatch and without waiting for the formal motion considered the evidence and ordered entry of judgment of acquittal on the first two counts. Requiring Gonzalez to move for acquittal on the last two counts would be an empty ritual.").

doubt to be of paramount importance to our notions of liberty, and thus, to the due process guaranteed by the Fifth and Fourteenth Amendments. In my view, the Court has consistently held that appellate courts must review the evidence supporting a criminal conviction to ensure that the evidence is sufficient for due process purposes, even if the defendant has forfeited the issue by not properly raising it in the district court or on appeal. Although the Supreme Court in its earlier cases allowed lower courts to review for "no evidence," in 1979, in *Jackson v. Virginia*, the Court breathed life into appellate review of the evidence supporting a conviction by requiring that the conviction be supported by *sufficient proof of guilt beyond a reasonable doubt*. Accordingly, after *Jackson v. Virginia*, courts of appeals must apply the sufficiency standard rather than the "no evidence" or "any evidence" standard.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). This bedrock constitutional principle is fundamental to the rule of law. "The standard of proof beyond a reasonable doubt, said the Court, 'plays a vital role in the American scheme of criminal procedure,' because it operates to give 'concrete substance' to the presumption of innocence to ensure against unjust convictions, and to reduce the risk of factual error in a criminal proceeding. . . . [T]he standard symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself." *Jackson*, 443 U.S. at 315 (quoting *Winship*, 397 U.S. at 363) (citing *Winship*, 397 U.S. at 372 (Harlan, J., concurring)). The "virtually unanimous adherence to the reasonable-doubt standard in common-law jurisdictions . . . 'reflect[s] a profound judgment about the way in which law should be enforced and justice administered.'" *Winship*, 397 U.S. at 361-62 (quoting *Duncan v. Louisiana*, 391 U.S. 145, 155 (1968)); *see also id.* at 372 (Harlan, J., concurring) ("I view the requirement of proof beyond a

reasonable doubt in a criminal case as bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.").

In *Jackson v. Virginia*, the Supreme Court held that "[a]fter *Winship* the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could *reasonably support* a finding of guilt *beyond a reasonable doubt*." *Id.* at 318-19 (emphases added). That is, the Court made clear that "[t]he *Winship* doctrine requires more than simply a trial ritual." *Id.* at 316-17. "A doctrine establishing so fundamental a substantive constitutional standard must also require that the factfinder will rationally apply that standard to the facts in evidence." *Id.* As the Court cautioned, "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." *Id.* However, "[u]nder *Winship*, which established proof beyond a reasonable doubt as an essential of Fourteenth Amendment due process, it follows that when such a conviction occurs . . . , *it cannot constitutionally stand*." *Id.* at 317-18 (emphasis added); *see also id.* at 316 ("*Winship* presupposes as an essential of the due process guaranteed by the Fourteenth [and Fifth] Amendment[s] that *no person* shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." (emphasis added)). In reaching this conclusion, the Court rejected an opposing rule that a guilty verdict should be upheld unless there was "no evidence" of guilt, because such a rule "is simply inadequate to protect against misapplications of the constitutional standard of reasonable doubt." *Id.* at 312-13, 320.

No. 07-41041

Thus, it is the duty of appellate courts to "protect against misapplications of the constitutional standard of reasonable doubt," *id.* at 320, and to enforce the constitutional guarantee that "*no person* shall be made to suffer the onus of a criminal conviction except upon *sufficient proof*," *id.* at 316 (emphases added). "Despite the deference that characterizes appellate review of jury verdicts, juries do not have *carte blanche*. The appellate function, properly understood, requires the reviewing court to take a hard look at the record and to reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative. This function is especially important in criminal cases, given the prosecution's obligation to prove every element of an offense beyond a reasonable doubt." *United States v. Spinney*, 65 F.3d 231, 234 (1st Cir. 1995); *see also United States v. Polk*, 56 F.3d 613, 630 (5th Cir. 1995) ("[C]ourts of appeal must not completely abdicate responsibility for reviewing jury verdicts." (internal quotation marks omitted)). *See generally* Jon O. Newman, *Beyond "Reasonable Doubt"*, 68 N.Y.U. L. Rev. 979, 993-97 (1993) (issuing an "urgent plea" to the courts of appeal to "take seriously our obligation" to reverse convictions based on insufficient evidence).

Because the requirement of sufficient proof of guilt beyond a reasonable doubt is fundamental to our notions of liberty and vital to the rule of law, it must be carefully guarded—even if not raised by the defendant. The Supreme Court held over a century ago that even when "th[e] question [of the sufficiency of the evidence] was not properly raised, yet *if a plain error was committed in a matter so absolutely vital to defendants*, we feel ourselves at liberty to correct it." *Wiborg v. United States*, 163 U.S. 632, 658 (1896) (emphasis added). The Court later reaffirmed this principle and further explained its importance:

> While no motion or request was made that the jury be instructed to find for defendant, . . . yet *Wiborg v. United States*, 163 U.S. 632, 658, 41 L. ed. 290, 298, 16 Sup. Ct. Rep. 1127, 1197,

> justifies us in examining the question in case a plain error has been committed in a matter so vital to the defendant.
>
>     . . . . No matter how severe may be the condemnation which is due to the conduct of a party charged with a criminal offense, it is the imperative duty of a court to see that all the elements of his crime are proved, or at least that testimony is offered which justifies a jury in finding those elements.  Only in the exact administration of the law will justice in the long run be done, and the confidence of the public in such administration be maintained.

*Clyatt v. United States*, 197 U.S. 207, 221-22 (1905).

In keeping with this understanding of due process—that "it is the imperative duty of a court to see that all the elements of [the] crime are proved," *id.*, and that a conviction based on insufficient evidence is a plain error that must be corrected, *Wiborg*, 163 U.S. at 658—the Supreme Court has instructed the federal appellate courts to consider the sufficiency of the evidence even when the issue was not raised in the district court, or was not raised on appeal.  *See Hemphill v. United States*, 312 U.S. 657, 657 (1941) (per curiam) (remanding to the Ninth Circuit "with directions to consider the sufficiency of the evidence to support the verdict" even though the issue had not been raised below); *United States v. Atkinson*, 297 U.S. 157, 160 (1936) ("In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings." (citing *Brasfield v. United States*, 272 U.S. 448, 450 (1926)).[4]

These decisions established the following principles: Ensuring that sufficient evidence supports criminal convictions is "a matter so absolutely vital

---

[4] *Brasfield* in turn cited *Clyatt* and *Wiborg*; and thus, the *Atkinson* standard is rooted in the principles that "it is the imperative duty of a court to see that all the elements of [the] crime are proved," *Clyatt*, 197 U.S. at 222; and that insufficient evidence of guilt is a plain error that must be corrected, even if forfeited by the defendant, *Wiborg*, 163 U.S. at 658.

to defendants" and to "the confidence of the public" in "the exact administration of the law" that the federal appellate courts have a duty to consider the sufficiency of the evidence even if the defendant has not raised it; and that a conviction supported by insufficient evidence is plain error that must be reversed. These principles were later codified in Rule 52(b) of the Federal Rules of Criminal Procedure, which provides: "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention." The original advisory committee notes to Rule 52(b) state: "This rule is a restatement of existing law, *Wiborg v. United States*, [163 U.S. 632, 658 (1896)]; *Hemphill v. United States*, [112 F.2d 505 (9th Cir. 1940), *rev'd*, 312 U.S. 657 (1941)]." Fed. R. Crim. P. 52 advisory committee's notes (1944); *see also United States v. Young*, 470 U.S. 1, 15 n.12 (1985) ("The Advisory Committee's Notes indicate that [Rule 52(b)] restated existing law as set forth by this Court in *Wiborg . . . .*").[5] The Court later reaffirmed that Rule 52(b) applies equally to plain errors that are not raised on appeal. *Silber v. United States*, 370 U.S. 717, 717-18 (1962). And recently, in *United States v. Olano*, 507 U.S. 725 (1993), the Supreme Court reaffirmed that Rule 52(b) "was intended as 'a restatement of existing law.'" *Id.* at 731 (quoting Fed. R. Crim. P. 52 advisory committee's notes). Indeed, the *Olano* Court specifically cited *Wiborg* as an example of a case in which "[t]he court of appeals should no doubt correct a plain forfeited error." *Id.* at 736 (citing *Wiborg*, 163 U.S. 632).

Following the clear mandate of *Wiborg* and *Clyatt* to guard against convictions based on insufficient proof of guilt, even if forfeited by the defendant,

---

[5] Although the Rules Advisory Committee's notes do not mention *Atkinson*, the Supreme Court has recognized that Rule 52(b) also incorporates the standard stated there, *viz.*, that an error must "seriously affect the fairness, integrity, or public reputation of judicial proceedings" to be correctable plain error. *See Young*, 470 U.S. at 7 (referring to "the standard laid down in *United States v. Atkinson*, 297 U.S. 157, 160 (1936), and codified in Federal Rule of Criminal Procedure 52(b)"); *see also United States v. Frady*, 456 U.S. 152, 163 n.13 (1982).

two panels of this court held that insufficiency-of-the-evidence is a plain error that must be corrected[6] (although later panels have unfortunately failed to follow these decisions); and several of our sister circuits have agreed that convicting a defendant based on insufficient evidence is a plain error under Rule 52(b). *See, e.g.*, *United States v. Santistevan*, 39 F.3d 250, 256-57 (10th Cir. 1994) ("[W]e believe the prosecution's failure to prove an essential element of the crimes charged beyond a reasonable doubt in this case offends our most fundamental sense of due process. *See In re Winship*, 397 U.S. 358, 364 (1970). Accordingly, it is appropriate for us to exercise our power to raise the sufficiency of the evidence *sua sponte* as plain error."); *United States v. Bowie*, 892 F.2d 1494, 1496-97 (10th Cir. 1990) ("When considering the sufficiency of the evidence to support the verdict, we have stated the plain error standard in different words, but the standard actually applied is essentially the same as if there had been a timely motion for acquittal." (citations omitted)); *United States v. Zolicoffer*, 869 F.2d 771, 774 (3d Cir. 1989) ("[T]he failure to prove one of the essential elements of a crime is the type of fundamental error which may be noticed by an appellate court notwithstanding the defendant's failure to raise it in the district court."), *reaffirmed in United States v. Gaydos*, 108 F.3d 505, 509 (3d Cir. 1997) (citing *Olano*, 507 U.S. at 732); *United States v. Golomb*, 811 F.2d 787, 793 (2d Cir.

---

[6] *United States v. Hines*, 563 F.2d 737, 740-41 (5th Cir. 1977) ("The failure of the appellant to move for acquittal at the close of the Government's case does not preclude our reversing this case upon a finding that there is not sufficient evidence to support the verdict. . . . [T]he error of submitting the case to the jury for determination is so plain and vital that this court is at liberty to and will reverse even in the absence of a proper motion and exception, not because the defendant has a right to demand a reversal, but solely in the public interest and to guard against injustice." (internal quotation marks omitted) (citing *Wiborg*, 163 U.S. at 658)); *Hall v. United States*, 286 F.2d 676, 677 (5th Cir. 1961) ("It is well settled that, where there is no substantial evidence to support a conviction in a criminal case, it is the duty of the trial court to direct a verdict of acquittal, regardless of whether a motion to that effect is made. If from the record or facts of which the court may take notice it appears that the conviction cannot be sustained, plain error appears on the record, and the judgment will be reversed." (internal quotation marks omitted) (citing *Clyatt*, 197 U.S. 207)).

No. 07-41041

1987) ("[T]he government's failure to prove an element of the offense is plain error."); *United States v. McIntyre*, 467 F.2d 274, 276 n.1 (8th Cir. 1972) ("[T]he plain error doctrine, Fed. R. Crim. P. 52(b), would undoubtedly apply in any case where evidence is lacking to support a conviction since under those circumstances it would clearly affect the substantial rights of the defendants." (citations omitted)); *Strickland v. United States*, 339 F.2d 866, 868 (10th Cir. 1965) ("[T]he Government failed to prove an essential element of the offense. This error is a fundamental one which may be noticed by the court, despite the fact that appellant failed to raise the issue properly in the trial court. Rule 52(b), Fed. R. Crim. P. . . . [W]here conviction was had without proof of one of the elements, it is necessary that the appellate court take notice although not properly raised at trial.").

## B.    The "devoid of evidence/manifest miscarriage of justice" standard

Nonetheless, the majority today unfortunately perpetuates an erroneous "devoid of evidence/manifest miscarriage of justice" standard that this court and a number of the other circuits have applied to forfeited insufficiency-of-the-evidence claims. Majority Op. 9-10.[7] This standard is seriously flawed because

---

[7] *E.g.*, *United State v. Carnes*, 309 F.3d 950, 956 (6th Cir. 2002) ("The evidence against Carnes on the witness tampering count is reviewed only for a 'manifest miscarriage of justice' because of his failure to make a motion for judgment notwithstanding the verdict pursuant to Fed. R.Crim. Pro. 29. Under this standard, we only reverse a conviction if the record is 'devoid of evidence pointing to guilt.'" (citation omitted)); *United States v. Pena-Lora*, 225 F.3d 17, 26 (1st Cir. 2000) ("[W]e will not reverse unless the conviction under Count 5 would result in a clear and gross injustice." (internal quotation marks omitted)); *United States v. Spinner*, 152 F.3d 950, 956 (D.C. Cir. 1998) ("When reviewing a sufficiency-of-the-evidence challenge for plain error, we reverse only to prevent a 'manifest miscarriage of justice.' Such a miscarriage would exist only if the record is devoid of evidence pointing to guilt, or . . . because the evidence on a key element of the offense was so tenuous that a conviction would be shocking." (alteration in original) (citation and internal quotation marks omitted)); *United States v. Parker*, 133 F.3d 322, 328 (5th Cir. 1998) ("A conviction may be reversed under the plain error standard only to avoid a manifest miscarriage of justice. Such a miscarriage would exist only if the record is devoid of evidence pointing to guilt, or . . . because the evidence on a key element of the offense was so tenuous that a conviction would be shocking." (alteration in

47

No. 07-41041

it: (1) undermines the fundamental due process guarantee that "no person" shall be convicted except upon sufficient proof of guilt beyond a reasonable doubt; (2) is obsolete after *Jackson* and mistakenly relies on cases decided during the Supreme Court's pre-*Jackson*, "no evidence" era; (3) is incompatible with the Supreme Court's opinions clarifying review under Federal Rule of Criminal Procedure 52(b); and (4) does not promote, but in fact offends important judicial policies. Accordingly, six of the other courts of appeals have not adopted this unconstitutional standard, and several prominent scholars have agreed that there should be no difference in the standard of review of the sufficiency of the evidence whether or not the defendant properly raised it.

1.    **Undermines due process protection against criminal conviction without sufficient proof of guilt beyond a reasonable doubt**

The "devoid of evidence/manifest miscarriage of justice" standard undermines the fundamental due process protection against criminal conviction without evidence sufficient to prove guilt beyond a reasonable doubt.

In *Jackson v. Virginia*, the Court held that "an essential of the due process guaranteed by the Fourteenth Amendment that *no person* shall be made to suffer the onus of a criminal conviction *except upon sufficient proof*—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." 443 U.S. at 316 (emphases added); *see*

---

original) (citation and internal quotation marks omitted)); *United States v. Meadows*, 91 F.3d 851, 855 (7th Cir. 1996) ("*Olano*'s requirements for plain error are met with respect to sufficiency of the evidence claims if the record is devoid of evidence pointing to guilt, or if the evidence on a key element of the offense was so tenuous that a conviction would be shocking." (internal quotation marks omitted); *United States v. Wright*, 63 F.3d 1067, 1072 (11th Cir. 1995) ("Appellant failed to move for a judgment of acquittal at the close of his case. Accordingly, we restrict our review of his claims to whether his conviction resulted in a manifest miscarriage of justice. Such a miscarriage would exist only if the record is devoid of evidence pointing to guilt, or if the evidence on a key element of the offense was so tenuous that a conviction would be shocking." (footnote and internal quotation marks omitted)).

48

*also id.* at 317-18 ("Under *Winship*, which established proof beyond a reasonable doubt as an essential of Fourteenth Amendment due process, it follows that when such a conviction occurs . . . , *it cannot constitutionally stand.*" (emphasis added)). The Court expressly rejected a "'no evidence' rule" akin to the majority's "devoid of evidence" standard—that a conviction should be upheld unless the record revealed "no evidence" of guilt—because such a rule "is simply inadequate to protect against misapplications of the constitutional standard of reasonable doubt." *Id.* at 320.

"[T]he prosecution's failure to prove an essential element of the crime[] charged beyond a reasonable doubt . . . offends our most fundamental sense of due process." *Santistevan*, 39 F.3d at 256-57 (citing *Winship*, 397 U.S. at 364). That is why it is our "imperative duty" to ensure that "all the elements of [the] crime are proved." *Clyatt*, 197 U.S. at 222. "Only in the exact administration of the law will justice in the long run be done, and the confidence of the public in such administration be maintained." *Id.* Application of the "devoid of evidence/manifest miscarriage of justice" standard will result in criminal convictions based on insufficient proof of guilt being upheld; and thus, it endorses an inexact administration of the law, which demands sufficient proof. Therefore, justice will not be done by applying a "devoid of evidence" standard.

> 2.    **Is obsolete after *Jackson* and mistakenly relies on cases decided during the Supreme Court's pre-*Jackson*, "no evidence" era**

The genesis of the "devoid of evidence/manifest miscarriage of justice" rule helps to explain why it is inconsistent with *Jackson v. Virginia*'s holding that due process demands sufficient proof of guilt beyond a reasonable doubt. Prior to *Jackson*, "the only constitutional ruling on sufficiency of evidence in a criminal case had been the unremarkable pronouncement in . . . *Thompson v.*

*City of Louisville*, [362 U.S. 199 (1960),] that due process was denied when there was no evidence whatsoever of a required element of a criminal offense." Newman, 68 N.Y.U. L. Rev. at 986-87 (footnote omitted). Under the *Thompson* "no evidence" standard, due process only required that a conviction was supported by *any* evidence of guilt, and thus, a conviction violated due process only when there was *no* evidence to support it, i.e., when the record was devoid of evidence of guilt. *See Jackson*, 443 U.S. at 312 ("Applying the 'no evidence' criterion of *Thompson* . . . the district court found the record devoid of evidence" of an element of the offense; the Fourth Circuit "appl[ied] the same 'no evidence' criterion of *Thompson*" and reversed the district court because it "was of the view that some evidence" of the element existed.). The same rule existed before *Thompson* as well. *See Thompson*, 362 U.S. at 206 n.13 (collecting cases).

In 1979, in *Jackson v. Virginia*, the Court reassessed the standard for reviewing the evidence due process. *See* 443 U.S. at 312-13 ("We granted certiorari to consider the petitioner's claim that under *In re Winship*, a [reviewing] court must consider not whether there was *any* evidence to support a state-court conviction, but whether there was sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt." (emphasis in original) (citation omitted)). The Court held that it was "readily apparent" that "the *Thompson* 'no evidence' rule is simply inadequate to protect against misapplications of the constitutional standard of reasonable doubt." *Id.* at 320. Therefore, the Court adopted the now-familiar "sufficiency of the evidence" formulation. *Id.* at 318.

It was during the "no evidence" era before *Jackson*, however, that this court first said that it would review forfeited claims of insufficient evidence to determine if "the record is wholly devoid of evidence pointing to guilt and that therefore justice has miscarried." *E.g.*, *Molina v. United States*, 162 F.2d 198, 198 (5th Cir. 1947); *see also Ansley v. United States*, 135 F.2d 207, 208 (5th Cir.

No. 07-41041

1943) ("It is true that the question may and should be raised by the court of its own motion, if necessary to prevent a miscarriage of justice . . . ." (no citation)).[8] The *Molina* court cited *Marco v. United States*, 26 F.2d 315 (9th Cir. 1928), for this proposition. There, the Ninth Circuit likewise stated, without supporting authority, that when there was no objection to the sufficiency of the evidence in the district court, the "[appellate] courts will only look into the record far enough to see that there has been no miscarriage of justice, or that there is some testimony tending to support the verdict." 26 F.2d at 316.

The "devoid of evidence" standard in *Molina*, and the "some testimony tending to support the verdict" standard in *Marco*, were merely expressions of what the Supreme Court, at that time, had held was required by due process to support a conviction: "any" evidence to sustain the verdict. *See Jackson*, 443 U.S. at 312-13. Thus, a proper understanding of the "devoid of evidence" standard in *Molina* is that in 1947, a forfeited claim of insufficient evidence was reviewed to determine if "the record [wa]s wholly devoid of evidence pointing to guilt," in which case, the conviction violated due process, and was "a miscarriage of justice." *Molina*, 162 F.2d at 198. Conversely, if the record contained "some

---

[8] The other formulation of "manifest miscarriage of justice" mentioned by the majority—that it is a manifest miscarriage of justice when "the evidence on a key element of the offense is so tenuous that a conviction would be shocking"—first appeared in *United States v. Landers*, 484 F.2d 93, 94 (5th Cir. 1973). *Landers* cited *United States v. Haney*, 429 F.2d 1282 (5th Cir. 1970), and *Whatley v. United States*, 428 F.2d 806, 807 (5th Cir. 1970). *Whatley* only referenced "manifest miscarriage of justice," 428 F.2d at 807; and *Haney* said, "Our review of the sufficiency of the evidence in this posture of the case is limited to a determination of whether there has occurred a 'manifest miscarriage of justice'. Such a miscarriage exists only if it appears that the record is 'devoid of evidence pointing to guilt.'" 429 F.2d at 1283. All of the cases cited in *Whatley* and *Haney* on this point lead back to *Molina*. Thus, the "so tenuous that a conviction would be shocking" formulation of *Landers* is grounded in the same "devoid of evidence/miscarriage of justice" formulation adopted in *Molina*. And like *Molina*, *Landers* pre-dates *Jackson v. Virginia*. Therefore, my explanation of the genesis of the "devoid of the evidence" standard applies equally to the alternative "so tenuous that a conviction would be shocking" formulation.

51

testimony tending to support the verdict," *Marco*, 26 F.2d at 316, the conviction did not violate due process, and thus, it was not a miscarriage of justice.

But, of course, *Jackson v. Virginia* recalibrated what evidence due process demanded to sustain a conviction.   No longer is "any" evidence acceptable, but instead, evidence sufficient to support a finding of guilt beyond a reasonable doubt is required.   Therefore, the "devoid of evidence/manifest miscarriage of justice" standard, which is grounded in the outmoded understanding of due process in which any evidence tending to support the guilty verdict is enough to uphold the verdict, does not comport with due process as it is understood following *Jackson v. Virginia*.[9]

### 3.    Conflicts with the Supreme Court's recent opinions clarifying review under Federal Rule of Criminal Procedure 52(b)

The "devoid of evidence/manifest miscarriage of justice" standard also conflicts with the Supreme Court's recent opinions clarifying review under Rule 52(b) of the Federal Rules of Criminal Procedure.

In *Olano*, the Court clarified that Rule 52(b) applies when (1) there is an error, (2) that is plain, and (3) that affects the defendant's substantial rights. 507 U.S. at 732; *see also United States v. Johnson*, 520 U.S. 461, 467 (1997). Lastly, when the above three conditions are met, Rule 52(b) confers discretion on the courts of appeals to correct the forfeited error.  *Olano*, 507 U.S. at 735. The Court "explained that the discretion conferred by Rule 52(b) should be

---

[9] The other circuits that apply the "devoid of evidence/manifest miscarriage of justice" standard similarly rely on cases decided during the Supreme Court's pre-*Jackson*, "no evidence" era. *E.g.*, *United States. v. Carnes*, 309 F.3d 950, 956 (6th Cir. 2002) (citing line of cases that cite back to pre-*Jackson* cases);*United States v. Pena-Lora*, 225 F.3d 17, 26 (1st Cir. 2000) (same); *United States v. Spinner*, 152 F.3d 950 (D.C. Cir. 1998) (same); *United States v. Meadows*, 91 F.3d 851, 855 (7th Cir. 1996) (same); *United States v. Wright*, 63 F.3d 1067, 1074 (11th Cir. 1995) (same).

employed in those circumstances in which a miscarriage of justice would otherwise result"; that "[i]n our collateral-review jurisprudence, the term 'miscarriage of justice' means that the defendant is actually innocent"; and thus, that "[t]he court of appeals *should* no doubt correct a plain forfeited error that causes the conviction or sentencing of an actually innocent defendant." *Id.* at 736 (emphasis added) (internal quotation marks omitted) (citing *Sawyer v. Whitley*, 505 U.S. 333, 339-40 (1992)). "[B]ut," the Court said, "we have never held that a Rule 52(b) remedy is *only* warranted in cases of actual innocence." *Id.* (emphasis in original). "Rather, . . . [t]he Court of Appeals *should* correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' . . . An error may 'seriously affect the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." *Id.* at 736-37 (emphasis added) (quoting *Atkinson*, 297 U.S. at 160).

Thus, *Olano* tells us that we should correct a plain forfeited error to prevent a miscarriage of justice, <u>and</u> that we should correct a plain forfeited error that seriously affects the fairness, integrity or public reputation of judicial proceedings. *Id.* at 736; *see also United States v. Garcia-Guizar*, 160 F.3d 511, 516 (9th Cir. 1998) ("We invoke plain error in our discretion to prevent a miscarriage of justice <u>or</u> to preserve the integrity and the reputation of the judicial process." (emphasis added)).

There is no question that a conviction based on insufficient evidence "seriously affects the fairness, integrity or public reputation of judicial proceedings." That standard comes from *Atkinson*, 297 U.S. at 160, and the *Atkinson* Court cited *Brasfield v. United States*, 272 U.S. 448, 450 (1926), which in turn cited *Clyatt*. In *Clyatt*, the Court reversed a conviction based on insufficient evidence even though the defendant had not preserved the claim, and explained that, "[n]o matter how severe may be the condemnation which is

No. 07-41041

due to the conduct of a party charged with a criminal offense, it is the imperative duty of a court to see that all the elements of his crime are proved, or at least that testimony is offered which justifies a jury in finding those elements. Only in the exact administration of the law will justice in the long run be done, and the confidence of the public in such administration be maintained." 197 U.S. at 222. Thus, it is clear that the *Atkinson* standard for plain error correction is met when a conviction is not supported by sufficient evidence as required by *Jackson v. Virginia. See also Cruz*, 554 F.3d at 845 ("When a conviction is predicated on insufficient evidence, the last two prongs of the *Olano* test will necessarily be satisfied: . . . [T]he 'fairness' and 'integrity' of the courts, are seriously affected when someone is sent to jail for a crime that, as a matter of law, he did not commit . . . ."); *Gaydos*, 108 F.3d at 509 (same).

The "devoid of evidence/manifest miscarriage of justice" standard, however, directly conflicts with *Olano. Olano* expressly held that Rule 52(b) is not limited to errors that involve a miscarriage of justice. 507 U.S. at 736 ("[W]e have never held that a Rule 52(b) remedy is *only* warranted in cases of actual innocence." (emphasis in original)). The Court held that *in addition* to miscarriages of justice, "[t]he Court of Appeals <u>should</u> correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings,'" because "[a]n error may 'seriously affect the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." *Id.* at 736-37 (emphasis added) (quoting *Atkinson*, 297 U.S. at 160). Since a conviction based on insufficient evidence seriously affects the fairness, integrity, and public reputation of judicial proceedings, under *Olano*, we should correct it. *See Atkinson*, 297 U.S. at 160; *Clyatt*, 197 U.S. at 222. Thus, the "devoid of evidence/manifest miscarriage of justice" standard improperly omits insufficiency-of-the-evidence plain error.

54

No. 07-41041

The majority discusses the "manifest miscarriage of justice" formula in the context of explaining what the term "plain" in "plain error" should mean, but that does not make much sense. If an error is only "plain" if it is a manifest miscarriage of justice, then it would render meaningless the *Olano* Court's holding that the courts of appeals "should" correct plain forfeited errors that seriously affect the fairness, integrity or public reputation of judicial proceedings," *in addition to* plain forfeited errors that entail a miscarriage of justice. 507 U.S. at 736. Moreover, the Court has never engrafted a novel meaning onto "plain" to require that the error must be beyond any possible dispute. Instead, the Supreme Court's explanation has simply been that "'[p]lain' is synonymous with 'clear' or, equivalently, 'obvious.'" *Id.* at 734. More recently, the Court said that "plain" means that "the legal error must be clear or obvious, rather than subject to *reasonable dispute*." *Puckett v. United States*, 556 U.S. 129, 135 (2009) (emphasis added). "[T]he relevant question [in reviewing for sufficiency of the evidence] is whether . . . any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The majority acknowledges that "[i]t may be that when no reasonable juror could find an element of a crime proved beyond a reasonable doubt, *it will often be plain or obvious* that the evidence was insufficient." Majority Op. 11 n.11 (emphasis added); *see also Cruz*, 554 F.3d at 844 ("[I]t is hard to comprehend how a standard can be any more stringent in actuality than that ordinarily applied to sufficiency-of-the-evidence challenges."). There is no support, then, for the majority's position that the insufficiency of the evidence must be so obvious—that the record is actually "devoid of evidence pointing to guilt"—such that it is beyond any possible dispute.

### 4. Does not promote, but in fact offends important judicial policies

Finally, the majority falls back on unpersuasive arguments for why limiting our review of forfeited sufficiency-of-the-evidence claims to a narrow category of "devoid of evidence" cases "promote[s] important judicial policies." Majority Op. 12. The majority first relies on *Puckett*, 556 U.S. at 134, but *Puckett* is inapposite. *Puckett* involved a forfeited claim that the Government had failed to meet its obligations under a plea agreement, not an insufficiency-of-the-evidence claim. *Id.* at 133-34. Moreover, the argument that the Court considered in *Puckett* was whether the plain error standard of Rule 52(b) should be applied at all to the defendant's claim. No one doubts here that Rule 52(b) governs Delgado's forfeited insufficiency-of-the-evidence claim.

The majority also reasons that its rule "ensures that the court is not placed in the position of an advocate scouring the record in search of hidden errors detrimental to one party in the case." Majority Op. 12. But this completely ignores the Supreme Court's admonishment that "it is the imperative duty of a court to see that all the elements of [the] crime are proved." *Clyatt*, 197 U.S. at 222. And "we have long held that, under the plain error inquiry, errors of constitutional dimension will be noticed more freely than less serious errors." *United States v. Knowles*, 29 F.3d 947, 951 (5th Cir. 1994). The majority gives no logical reason why we should ignore these principles and instead, limit the cases of insufficient evidence that we will correct to only those in which the record is devoid of evidence.

Moreover, it is actually inefficient to uphold on direct appeal a defendant's conviction that is supported by insufficient evidence simply because the record is not devoid of evidence. In such a case, the defendant will be able to obtain habeas relief for the ineffective assistance of her trial counsel or appellate counsel for failing to object to the sufficiency of the evidence. *See United States*

No. 07-41041

*v. Bass*, 310 F.3d 321, 325-30 (5th Cir. 2002) (concluding that the evidence was insufficient under the *Jackson v. Virginia* sufficiency-of-the-evidence standard and vacating defendant's conviction based on ineffective assistance of his counsel in failing to raise the issue on appeal).  Accordingly, any defendant whose conviction is based on insufficient evidence but whose attorney failed to raise the issue will ultimately be entitled to relief from that conviction.  Thus, nothing is gained by having an appellate court review the evidence under a more deferential standard on direct appeal only to have to go back later and review the evidence anew under the proper standard when the defendant later brings a collateral attack.

**5.     Six of the other courts of appeals have not adopted a "devoid of evidence/miscarriage of justice" standard, and several prominent scholars have agreed that there should be no difference in the standard of review of the sufficiency of the evidence whether or not the defendant properly raised it**

As mentioned before, the "devoid of evidence/manifest miscarriage of justice" standard does find support in the jurisprudence of a number of the circuits, including this one.[10]  However, based on the constitutionally significant flaws in that standard, it is not surprising that six circuits have not adopted it. The Third, Eighth, and Tenth Circuits have held that a conviction based on insufficient evidence *is itself* plain error under Rule 52(b).[11]  The Ninth Circuit

---

[10] *See* cases cited *supra* note 7.

[11] *United States v. Wolfe*, 245 F.3d 257, 261 (3d Cir. 2001) ("[T]he prosecution's failure to prove an essential element of the offense constitutes plain error under Rule 52(b) of the Federal Rules of Criminal Procedure."); *United States v. Gaydos*, 108 F.3d 505, 509 (3d Cir. 1997) ("Gaydos did not preserve this issue for appeal by filing a timely motion for a judgment of acquittal, so we review the sufficiency of the evidence under a plain error standard. . . . We believe that affirming a conviction where the government has failed to prove each essential element of the crime beyond a reasonable doubt 'affect[s] substantial rights,' and seriously impugns 'the fairness, integrity and public reputation of judicial proceedings.'" (alteration in original) (quoting *Olano*, 507 U.S. at 732); *United States v. Santistevan*, 39 F.3d 250, 256-57

has applied a standard of review to forfeited insufficiency-of-the-evidence claims that is substantively the same as that applied when the issue is properly raised.[12] The Second and Fourth Circuits have said that they will review forfeited insufficiency-of-the-evidence claims for plain error and neither has adopted a "devoid of evidence" standard.[13] And although the Eleventh Circuit

---

(10th Cir. 1994) ("[W]e believe the prosecution's failure to prove an essential element of the crimes charged beyond a reasonable doubt in this case offends our most fundamental sense of due process. *See In re Winship*, 397 U.S. 358, 364 (1970). Accordingly, it is appropriate for us to exercise our power to raise the sufficiency of the evidence *sua sponte* as plain error."); *United States v. Bowie*, 892 F.2d 1494, 1496-97 (10th Cir. 1990) ("When considering the sufficiency of the evidence to support the verdict, we have stated the plain error standard in different words, but the standard actually applied is essentially the same as if there had been a timely motion for acquittal." (citations omitted)); *United States v. Zolicoffer*, 869 F.2d 771, 774 (3d Cir. 1989) ("[T]he failure to prove one of the essential elements of a crime is the type of fundamental error which may be noticed by an appellate court notwithstanding the defendant's failure to raise it in the district court."); *United States v. McIntyre*, 467 F.2d 274, 276 n.1 (8th Cir. 1972) ("[T]he plain error doctrine, Fed. R. Crim. P. 52(b), would undoubtedly apply in any case where evidence is lacking to support a conviction since under those circumstances it would clearly affect the substantial rights of the defendants." (citations omitted)); *Strickland v. United States*, 339 F.2d 866, 868 (10th Cir. 1965) ("[T]he Government failed to prove an essential element of the offense. This error is a fundamental one which may be noticed by the court, despite the fact that appellant failed to raise the issue properly in the trial court. Rule 52(b), Fed. R. Crim. P. . . . [W]here conviction was had without proof of one of the elements, it is necessary that the appellate court take notice although not properly raised at trial.").

[12] *See United States v. Flyer*, 633 F.3d 911, 917 (9th Cir. 2011) ("[E]ven under plain-error review, a court should not affirm a conviction if the record clearly showed that the evidence was insufficient." (second alteration in original) (internal quotation marks and ellipsis omitted)); *United States v. Cruz*, 554 F.3d 840, 844 (9th Cir. 2009) ("Cruz failed to renew his motion. As a result, the standard of review in this case rises to the at least theoretically more stringent 'plain error' standard. We say 'theoretically' because, while plain-error review appears more stringent in theory, it is hard to comprehend how a standard can be any more stringent in actuality than that ordinarily applied to sufficiency-of-the-evidence challenges." (citation omitted)); *see also id.* at 853 (Kozinski, J., dissenting) (explaining that the majority's conclusion that the error was plain was no different than simply finding error).

[13] *See United States v. Wallace*, 515 F.3d 327, 332 (4th Cir. 2008); *United States v. Muniz*, 60 F.3d 65, 67 (2d Cir. 1995) ("A convicted defendant who fails to raise the issue of insufficient evidence in the trial court cannot prevail on that ground on appeal unless it was plain error for the trial court not to dismiss on its own motion."), *rev'd on reconsideration, on other grounds*, 184 F.3d 114 (2d Cir. 1997); *id.* at 73-74 (Kearse, J., dissenting) ("I am not

has said that it applies a "devoid of evidence/manifest miscarriage of justice" standard, it recently reviewed a forfeited insufficiency-of-the-evidence claim for plain error without mentioning this standard, and instead applied a sufficiency-of-the-evidence standard.[14]    Moreover, this court has recently questioned whether there is a distinct standard of review for forfeited insufficiency-of-the-evidence claims;[15] and in one case in this court, the Government conceded there was no distinction.[16] Finally, several prominent scholars agree that there should

---

aware of any case in which we have found the evidence insufficient to establish guilt beyond a reasonable doubt and yet have refused to find that error "plain" and reversible." (citing *United States v. Gjurashaj*, 706 F.2d 395, 399 n.6 (2d Cir. 1983); *United States v. Kaplan*, 586 F.2d 980, 982 n.4 (2d Cir. 1978)); *United States v. Golomb*, 811 F.2d 787, 793 (2d Cir. 1987) ("It has . . . been held that the government's failure to prove an element of the offense is plain error." (citing *Strickland*, 339 F.2d at 868); *see also United States v. Draper*, 553 F.3d 174, 181 (2d Cir. 2009) (Sotomayor, J.) ("[T]he 'failure by the [g]overnment to adduce sufficient evidence . . . is a defect affecting substantial rights which we may notice under F.R.Cr.P. 52(b).' " (second and third alterations in original) (quoting *Kaplan*, 586 F.2d at 982 n.4)).

[14] *See United States v. Barrington*, 648 F.3d 1178, 1192 (11th Cir. 2011) ("In sum, the evidence was sufficient to support Barrington's convictions for aggravated identity theft. There is no plain error."), *cert. denied*, --- S. Ct. ---, 2012 WL 33684 (Jan. 9, 2012).

[15] *See United States v. Laury*, 49 F.3d 145, 151 n.15 (5th Cir. 1995) ("In a recent decision, this Court questioned whether the 'miscarriage of justice' standard is distinguishable from the 'sufficiency of evidence' standard employed if a defendant does make a motion for acquittal at the conclusion of the trial." (citing *United States v. Pennington*, 20 F.3d 593, 597 n.2 (5th Cir. 1994)); *see also United States v. Meadows*, 91 F.3d 851, 855 n.6 (7th Cir. 1996) ("The Fifth Circuit has questioned whether this plain error standard is distinguishable from the sufficiency of the evidence standard employed if the defendant does make a proper motion for acquittal to the district court." (citing *Laury*, 49 F.3d at 151 n.15)).

[16] *See Pennington*, 20 F.3d at 597 n.2 ("The government claims that because the motion for acquittal was not renewed after the close of the defendants' cases, the failure to grant a motion for acquittal should be reviewed under the plain error standard.  Pennington responds by noting that the standard should be the same, regardless of whether the motion is renewed or made at all, because a conviction on insufficient evidence is necessarily a miscarriage of justice under the plain error standard. The government eventually concedes that the standards are indistinguishable, citing *United States v. Davis*, 583 F.2d 190, 199 (5th Cir.1978) (Clark, J., concurring)." (citation omitted)).

be no difference between the standards of appellate review for preserved and forfeited claims of insufficient evidence.[17]

We should take this en banc opportunity to join our six sister circuits that reaffirm the constitutionally mandatory standard required by *Jackson* for appellate review of plain insufficiency-of-evidence errors even if they have been forfeited on appeal, and to reject the erroneous "devoid of evidence" standard perpetuated by the majority today.

## III.    Insufficiency of the evidence

In accord with the principles explained above, even though Delgado forfeited the issue of the sufficiency of the evidence supporting her conspiracy conviction, we must, nonetheless, review the evidence to determine whether it is sufficient under no less a standard than that compelled by the Due Process Clause.  "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt."  *Id.* at 318. Accordingly, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the

---

[17] *See* 2 Steven Alan Childress & Martha S. Davis, *Federal Standards of Review* § 9.12, at 9-37 to -38 (4th ed. 2010) ("[T]here really is no difference as to the theoretical level of review exercised by the courts [for preserved or forfeited sufficiency claims.]  [N]or should there be any difference constitutionally . . . because it would appear to be an error amounting to a due process violation to allow conviction on anything less than [sufficient] evidence . . . ." (footnote omitted)); 2A Wright & Henning, *supra* § 469, at 394 ("The language used by the courts suggests an exacting standard is applied before evidence is reviewed in the absence of a proper motion, but it may be doubted whether this is the case.  Under Rule 52(b) the appellate court is permitted to notice 'plain errors or defects affecting substantial rights.'  The Supreme Court said years ago that 'it is the imperative duty of a court to see that all the elements of his crime are proved, or at least that testimony is offered which justifies a jury in finding those elements.'  The insufficiency of the evidence was said to require reversal because 'a plain error has been committed in a matter so vital to the defendant.'" (quoting *Clyatt*, 197 U.S. at 222)).

No. 07-41041

essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original).

## A.    Guiding principles for reviewing the sufficiency of the evidence of a conspiracy conviction

Our analysis of whether the record evidence is sufficient to prove the defendant's guilt of conspiracy beyond a reasonable doubt has long been guided by certain principles. Nearly seventy years ago, the Supreme Court made clear that "charges of conspiracy are not to be made out by piling inference upon inference." *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943). In *Jackson v. Virginia*, the Court stated that "[a] 'reasonable doubt,' at a minimum, is one based upon 'reason.'" 443 U.S. at 317. Consistent with this exhortation, "[a] conviction must be overturned if it is based on speculation alone" because "'[a] verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference.'" *E.g.*, *United States v. Rojas Alvarez*, 451 F.3d 320, 333 (5th Cir. 2006) (quoting *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996)).[18]

---

[18] *Accord United States v. Archer*, --- F.3d ---, 2011 WL 4360013, at *7 (2d Cir. Sept. 20, 2011) ("The government must . . . show more than evidence of a general cognizance of criminal activity, suspicious circumstances, or mere association with others engaged in criminal activity." (internal quotation marks omitted)); *United States v. Irvin*, 656 F.3d 1151, 1171 (10th Cir. 2011) ("While the jury may draw reasonable inferences from direct or circumstantial evidence, an inference must be more than speculation and conjecture to be reasonable, and caution must be taken that the conviction not be obtained by piling inference on inference." (internal quotation marks omitted)); *United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) ("[W]hen the government relies on circumstantial evidence, reasonable inferences, not mere speculation, must support the conviction." (internal quotation marks omitted)); *United States v. Lovern*, 590 F.3d 1095, 1109 (10th Cir. 2009) ("[I]t is a bedrock promise of our criminal justice system that the evidence supporting a conviction must raise more than the mere suspicion of guilt, and the jury's inferences must be more than speculation and conjecture in order to be reasonable." (internal quotation marks omitted)); *United States v. Espinosa*, 585 F.3d 418, 427 (8th Cir. 2009) ("We cannot sustain a conviction based on mere suspicion or the possibility of guilt." (internal quotations and citation omitted)); *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) ("[A] conviction based on speculation and surmise alone cannot stand."); *United States v. Kurt*, 986 F.2d 309, 312 (9th Cir. 1993)

No. 07-41041

Likewise, while we must view the evidence in the light most favorable to the prosecution, *Jackson*, 443 U.S. at 319, "we do not give the government the benefit of *every potential* inference but rather, only those inferences reasonably and logically flowing from the other evidence," *Santistevan*, 39 F.3d at 258 (emphasis in original); *see also Jackson*, 443 U.S. at 319 (It is "the responsibility of the trier of fact . . . to draw *reasonable* inferences from basic facts to ultimate facts." (emphasis added)); *United States v. Percel*, 553 F.3d 903, 910 (5th Cir. 2008) (We must accept "*reasonable* inferences from the evidence to support the verdict." (emphasis added) (internal quotation marks omitted)). Moreover, in deciding whether an inference is reasonable, "[w]e consider the countervailing evidence as well as the evidence that supports the verdict." *E.g.*, *United States v. Brown*, 186 F.3d 661, 664 (5th Cir. 1999) (internal quotation marks omitted).

Applying these principles, it is clear that the evidence of a conspiratorial agreement is insufficient under *Jackson*. Perhaps the majority's contrary conclusion is explained by the fact that its opinion fails to mention even one of these fundamental rules.

**B.    The evidence is insufficient to prove that a drug distribution agreement existed**

In my view, the record admits only to speculation that Delgado had entered into an agreement with any bona fide conspirator to further distribute marijuana. Only three possible conspirators can be imagined: the government cooperator, Vasquez; the unknown supplier of the marijuana; and the unidentified North Carolina buyer. However, Vasquez, who was a government informer, could not be a bona fide conspirator, because "there can be no

---

("[C]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction. Mere suspicion or speculation, however, is insufficient." (alteration in original) (internal quotation marks and citation omitted)).

62

No. 07-41041

indictable conspiracy with a government informer who secretly intends to frustrate the conspiracy." *Sears v. United States*, 343 F.2d 139, 142 (5th Cir. 1965).[19]    As to the unknown supplier and the unidentified buyer, the Government introduced no evidence showing that Delgado agreed to anything beyond one buy and one sale of a quantity of marijuana.  Each transaction establishes, at most, a buyer-seller relationship, and not a drug distribution agreement.  However, "a buyer-seller relationship, without more, will not prove a conspiracy." *United States v. Maseratti*, 1 F.3d 330, 336 (5th Cir. 1993); *accord United States v. Colon*, 549 F.3d 565, 569 (7th Cir. 2008) ("What is necessary and sufficient is proof of an agreement to commit a crime other than the crime that consists of the sale itself.").[20]

Courts have identified factors that, when combined with other evidence of a conspiracy, *may* support (without requiring) an inference of an agreement to commit a separate crime beyond a simple sale; none of those factors is present in this case.  There is no evidence of "prolonged cooperation" between Delgado

---

[19] This is the unquestioned law in all of the ten circuits to have addressed this issue. *See, e.g.*, *United States v. Corson*, 579 F.3d 804, 811 (7th Cir. 2009); *United States v. Paret-Ruiz*, 567 F.3d 1, 6 (1st Cir. 2009); *United States v. Carlton*, 442 F.3d 802, 811 (2d Cir. 2006); *United States v. Nunez*, 889 F.2d 1564, 1569 (6th Cir. 1989); *United States v. Barboa*, 777 F.2d 1420, 1422 & n.1 (10th Cir. 1985); *United States v. Escobar de Bright*, 742 F.2d 1196, 1999 (9th Cir. 1984); *United States v. Tombrello*, 666 F.2d 485, 490 n.3 (11th Cir. 1982); *United States v. Moss*, 591 F.2d 428, 434 n.8 (8th Cir. 1979); *United States v. Chase*, 372 F.2d 453, 459 (4th Cir. 1967); *Sears*, 343 F.2d at 142.

[20] This is the law in every circuit.  *See, e.g.*, *United States v. Young*, 609 F.3d 348, 354-55 (4th Cir. 2010); *United States v. Deitz*, 577 F.3d 672, 680 (6th Cir. 2009); *United States v. Parker*, 554 F.3d 230, 234 (2d Cir. 2009); *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999); *United States v. Thomas*, 114 F.3d 228, 241 (D.C. Cir. 1997); *United States v. Santiago*, 83 F.3d 20, 23-24 (1st Cir. 1996); *United States v. Lennick*, 18 F.3d 814, 819 n.4 (9th Cir. 1994); *United States v. Finch*, 16 F.3d 228, 231 (8th Cir. 1994); *Maseratti*, 1 F.3d at 336; *United States v. Manzella*, 791 F.2d 1263, 1265 (7th Cir. 1986); *United States v. Dickey*, 736 F.2d 571, 583 (10th Cir. 1984); *United States v. Solomon*, 686 F.2d 863, 876 (11th Cir. 1982).

No. 07-41041

and anyone (besides, perhaps, Vasquez, who is an ineligible conspirator);[21] nor is there evidence that the marijuana was "fronted" or "sold on credit" to Delgado[22] or by Delgado.[23] Also distinguishable from this case are cases in which a seller helped a buyer "to create a distribution system for his illegal product"; and cases in which a buyer had "agreed to look for other customers" for the seller, "had received a commission on sales to those customers," "had advised [the seller] on the conduct of [his] business[;] or had agreed to warn [the seller] of threats to [his] business from competing dealers or from law-enforcement authorities."[24] The trial evidence in this case showed none of these factors from which a rational jury could infer a drug distribution agreement.

---

[21] *E.g., Direct Sales*, 319 U.S. at 713; *United States v. Hicks*, 368 F.3d 801, 805 (7th Cir. 2004); *United States v. Wyche*, 65 F. App'x 509, 2003 WL 1922966, at *3 (5th Cir. 2003) (unpublished).

[22] *United States v. Hawkins*, 547 F.3d 66, 74 (2d Cir. 2008); *see also Hicks*, 368 F.3d at 805; *United States v. Posada-Rios*, 158 F.3d 832, 860 (5th Cir. 1998); *United States v. Price*, 13 F.3d 711, 728 (3d Cir. 1994); *United States v. Hughes*, 817 F.2d 268, 273 (5th Cir. 1987); *United States v. Carbone*, 798 F.2d 21, 27 (1st Cir. 1986). *But see Bass,* 310 F.3d at 329 (relying on the conclusion in *United States v. Ward*, 37 F.3d 243, 248 (6th Cir. 1994), that "fronting of drugs and providing meeting instructions were only incidental to a buyer-seller relationship"); *Ward*, 37 F.3d at 248 ("Fronting cocaine, without additional elements of control, is nothing more than a variation on the traditional buyer-seller relationship.").

[23] The majority says that the evidence shows that "Delgado was waiting to be paid by her buyer for the marijuana in advance of shipment." Majority Op. 14-15. That unreasonable inference is addressed further *infra*. What is important to note here is that payment in advance of delivery is obviously different than—indeed, the opposite of—"fronting" or "sales on credit" of drugs.

[24] *Colon*, 549 F.3d at 568, 570 (citing *United States. v. Sax*, 39 F.3d 1380, 1385-86 (7th Cir. 1994)); *see also United States v. Brown*, 217 F.3d 247, 255 (5th Cir. 2000) (holding that the defendants were members of a conspiracy because, inter alia, they "warn[ed] each other of police activity and referr[ed] customers to each other when unable to supply customers themselves"), *vacated on other grounds sub nom. Randle v. United States*, 531 U.S. 1136 (2001) (mem.), *as recognized in Colon*, 549 F.3d at 570; *Posada-Rios*, 158 F.3d at 860 ("[E]vidence that [a buyer] purchased some of the cocaine on consignment . . . is 'strong evidence' of membership in a conspiracy because it indicates a strong level of trust and an ongoing, mutually dependent relationship." (quoting *United States v. Rodriguez*, 53 F.3d 1439, 1445 (7th Cir. 1995)); *United States v. Pozos*, 697 F.2d 1238, 1241 (5th Cir. 1983).

No. 07-41041

Nor could a rational jury infer a conspiracy based on the fact that Vasquez testified that "according to her [Delgado's] information[,] . . . she was going to wait till nighttime to take that marijuana back to her source of supply." As the panel majority here explained: "[T]he ability to return merchandise is a feature of many ordinary retail transactions and does not usually indicate the existence of a broader agreement between the merchant and the customer. Thus, the Second Circuit has held that when a buyer bought 170 ounces of cocaine and later returned 75 ounces to the seller, it could not be inferred that the buyer was in a conspiracy with the seller. *United States v. Koch*, 113 F.2d 982, 983 (2d Cir. 1940)." *United States v. Delgado*, 631 F.3d 685, 696 n.9 (5th Cir. 2011). Moreover, there is no evidence that Delgado received the marijuana on credit, as opposed to having simply purchased it. *Cf. Posada-Rios*, 158 F.3d at 860 ("[E]vidence that [a buyer] purchased some of the cocaine on consignment . . . is 'strong evidence' of membership in a conspiracy because it indicates a strong level of trust and an ongoing, mutually dependent relationship."). Therefore, there is no evidence of a continuing, symbiotic relationship between Delgado and the person who may have supplied her with marijuana.

Nor could a rational jury, without piling inference upon inference, find beyond a reasonable doubt that a conspiracy existed simply because of the amount of marijuana (230 kilograms) that was found in the truck on Delgado's property. This court has held that "the quantity of contraband alone" is "insufficient to establish a conspiracy." *United States v. Morgan*, 835 F.2d 79, 82 (5th Cir. 1987) ("over 200 pounds of marijuana"). And in several cases we have held that evidence of a large quantity of drugs—over 1000 pounds of marijuana—even coupled with evidence of other potential co-conspirators was still insufficient to prove a conspiracy.[25] Likewise, the Second, Seventh, and

---

[25] *See United States v. Villasenor*, 894 F.2d 1422, 1426, 1429 (5th Cir. 1990) (reversing conspiracy conviction where over 1000 pounds of marijuana were discovered in room with "an

65

No. 07-41041

Tenth Circuits have all held that the purchase or sale of a bulk quantity of illegal drugs is insufficient to support a conspiracy conviction.[26]

The reason that evidence of the quantity of drugs—and of an intent to return the drugs—cannot prove a conspiracy is because the government must establish not only that the seller *knew* the buyer intended to engage in further

---

industrial vacuum cleaner, numerous trash bags, rolls of duct tape, and plastic self-sticking paper, which is commonly used to package marihuana," and even though other people were present in the house); *United States v. Hernandez-Palacios*, 838 F.2d 1346, 1349 (5th Cir. 1988) (reversing conspiracy conviction where over 1000 pounds of marijuana were found concealed in hidden compartments and sealed portions of fuel tanks of two busses, one of which defendant was riding in, and which busses the defendant said he owned and was in charge of; and there was evidence of at least six other potential conspirators); *United States v. Sheikh*, 654 F.2d 1057 (5th Cir. 1981) (evidence was insufficient to prove a conspiracy where 4.4 pounds of heroin were shipped to the defendant from Iran and there was significant evidence of potential conspirators), *overruled on other grounds by United States v. Zuniga-Salinas*, 952 F.2d 876 (5th Cir. 1992), *as recognized in United States v. Mackay*, 33 F.3d 489, 493 (5th Cir. 1994).

[26] *Parker*, 554 F.3d at 235-36 (holding that, when wholesale quantities of drugs are involved, "the liability of buyer and seller for having conspired together to transfer drugs would depend not on the seller's mere knowledge of the buyer's intent to retransfer, but on a further showing of the seller's interest, shared with the buyer, in the success of the buyer's resale"); *United States v. Rivera*, 273 F.3d 751, 755 (7th Cir. 2001) ("Showing that the buyer purchased a quantity larger than could be used for personal consumption . . . is not enough to show conspiracy on behalf of the seller."); *United States v. Contreras*, 249 F.3d 595, 600 (7th Cir. 2001) (holding that evidence that the defendant bought "ten one-kilogram quantities of cocaine . . . over a period of six to ten months" from the same supplier was only evidence of a buyer-seller relationship and not a conspiracy); *United States v. Howard*, 966 F.2d 1362, 1364 (10th Cir. 1992) ("The huge quantity of crack cocaine involved in this case permits an inference of conspiracy, but by itself this is not enough to convict defendant."); *United States v. Levario*, 877 F.2d 1483, 1486 (10th Cir. 1989) ("Although the massive quantity of cocaine involved here permits an inference of a conspiracy, standing alone, it is wholly insufficient to sustain a conviction."), *overruled on other grounds by Gozlon-Peretz v. United States*, 498 U.S. 395 (1991); *United States v. Borelli*, 336 F.2d 376, 384 (2d Cir. 1964) ("A seller of narcotics in bulk surely knows that the purchasers will undertake to resell the goods over an uncertain period of time, and the circumstances may also warrant the inference that a supplier or a purchaser indicated a willingness to repeat. But a sale or a purchase scarcely constitutes a sufficient basis for inferring agreement to cooperate with the opposite parties for whatever period they continue to deal in this type of contraband, unless some such understanding is evidenced by other conduct which accompanies or supplements the transaction."); *Koch*, 113 F.2d at 983 (holding that evidence was insufficient to prove a conspiracy even though "[t]he amount of the cocaine purchased [170 ounces] would, of course, indicate that it was taken not for personal consumption alone but for resale").

distribution, but that the seller *intended* and *agreed* to the shared intent of the buyer to further distribute. "There may be circumstances in which the evidence of knowledge is clear, yet the further step of finding the required intent cannot be taken. . . . [N]ot every instance of sale of restricted goods . . . in which the seller knows the buyer intends to use them unlawfully, will support a charge of conspiracy." *Direct Sales*, 319 U.S. at 712. Accordingly, the First, Second, Third, Seventh, and Ninth Circuits have all stated that even where the evidence shows that the seller knew that the buyer was purchasing a quantity of drugs in order to resell them, without additional evidence of a distribution agreement, the evidence only shows a buyer-seller relationship.[27]

Thus, it is clear that there was simply no evidence from which a rational jury could find beyond a reasonable doubt a joint endeavor between Delgado and anyone (other than the government informant) to possess with the intent to distribute drugs. Because the evidence is insufficient to prove every element of

---

[27] *See United States v. Boidi*, 568 F.3d 24, 30 (1st Cir. 2009) ("'Evidence that a buyer intends to resell the product instead of personally consuming it does not necessarily establish that the buyer has joined the seller's distribution conspiracy. This is so even if the seller is aware of the buyer's intent to resell.'" (quoting *Hawkins*, 547 F.3d at 74)); *Parker*, 554 F.3d at 235-36 ("[I]t is often said that mere awareness on the part of the seller that the buyer intends to resell the drugs is not sufficient to show that the seller and the buyer share a conspiratorial intent to further the buyer's resale. This is because the seller cannot be considered to have joined a conspiracy with the buyer to advance the buyer's resale unless the seller has somehow encouraged the venture or has a stake in it—an interest in bringing about its success. The transferor's mere knowledge of the transferee's intent to retransfer to others, without anything more, would not show that the transferor had a stake or interest in the further transfer of the drugs." (citations omitted)); *United States v. Thomas*, 150 F.3d 743, 745 (7th Cir. 1998) (It was plain error not to instruct the jury on the buyer-seller rule in a case where the defendant bought cocaine for resale from the same supplier on three occasions, because "[n]one of the evidence suggests that [the seller] had any stake in [the buyer's] profits from [the resale]; all deals were cash on the barrelhead."); *Lennick*, 18 F.3d at 819 ("To show a conspiracy, the government must show not only that Lennick gave drugs to other people knowing that they would further distribute them, but also that he had an agreement with these individuals to so further distribute the drugs."); *Price*, 13 F.3d at 727 ("[T]hose courts that have addressed the purchase-for-redistribution issue have determined that such a purchase is not sufficient, in and of itself, to prove membership in the larger conspiracy.").

the offense beyond a reasonable doubt, I would reverse Delgado's conspiracy conviction.

## C.    The majority's mistaken view that the evidence is sufficient

The majority by contrast, concludes that "the evidence presented at trial was more than sufficient to support Delgado's conspiracy conviction." Majority Op. 12. Although the majority purports to apply a sufficiency standard, and not the "devoid of evidence" standard that it says governs this case, it is clear that the majority does not actually apply the *Jackson v. Virginia* standard because it bases its finding on mere speculation and piles of inferences, which is plainly not evidence that supports a finding of proof beyond a reasonable doubt. Thus, the majority, despite its contrary representation, has not applied, but has jettisoned the *Jackson v. Virginia* sufficiency-of-the-evidence test and has in fact applied what could be called an "any evidence," "scintilla of evidence," or "modicum of evidence" test because the finding of a conspiratorial agreement here is plainly not warranted by the probative evidence introduced at trial.

First, the majority seriously misconstrues the "buyer-seller" rule. The majority says that "[t]he buyer-seller exception . . . shields mere acquirers and street-level users, who would otherwise be guilty of conspiracy to distribute, from more severe penalties reserved for distributers." Majority Op. 12. But the buyer-seller doctrine is not, as the majority states, an "exception" to liability otherwise established, but a recognition that unless the buyer and the seller have reached an agreement to further distribute the drugs, there simply is no punishable conspiracy and hence, no liability for conspiracy.

"What distinguishes a conspiracy from its substantive predicate offense is not just the presence of any agreement, but an agreement with the same joint criminal objective." *United States v. Dekle*, 165 F.3d 826, 829 (11th Cir. 1999). The indictment here charged Delgado only with a conspiratorial agreement to

possess marijuana with the intent to distribute it. "This joint objective is missing where the conspiracy is based simply on an agreement between a buyer and a seller for the sale of drugs. Although the parties to the sales agreement may both agree to commit a crime, they do not have the joint criminal objective of distributing drugs." *Id.* That is, an alleged conspirator's mere knowledge of Delgado's intent and objective is insufficient; the state of mind must proceed beyond knowledge and intent to an agreement to a shared objective. *Direct Sales*, 319 U.S. at 712; *see also* 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 12.2(c)(3) (1986) (emphasizing the importance of "the step from knowledge to intent and agreement" in *Direct Sales*). "Evidence that a buyer intends to resell the product instead of personally consuming it does not necessarily establish that the buyer has joined the seller's distribution conspiracy. This is so even if the seller is aware of the buyer's intent to resell." *Boidi*, 568 F.3d at 30 (internal quotation marks omitted) (quoting *Hawkins*, 547 F.3d at 74) (citing *Lechuga*, 994 F.2d at 349; *United States v. Glenn*, 828 F.2d 855, 857-58 (1st Cir. 1987) (Breyer, J.)).

"There are practical reasons for not conflating sale with conspiracy. 'A sale, by definition, requires two parties; their combination for that limited purpose does not increase the likelihood that the sale will take place, so conspiracy liability would be inappropriate.' . . . 'A conspiracy involves more people and can therefore commit more crimes; and it can do so more efficiently, by exploiting the division of labor and by arranging concealment more effectively—sometimes through suborning law enforcers.' There is nothing like that here, so far as [Delgado's] involvement was concerned. And the situation is not altered just because [s]he was a buyer for resale rather than for h[er] personal consumption." *Colon*, 549 F.3d at 569 (citations omitted) (quoting *United States v. Townsend*, 924 F.2d 1385, 1394 (7th Cir. 1991); *United States v. Manzella*, 791 F.2d 1263, 1265 (7th Cir. 1986)).

No. 07-41041

As explained above, the trial record does not reveal even one factor that courts have said may support an inference of an agreement to commit a separate crime beyond a buyer-seller relationship. Significantly, the majority is unable to point to anything in the record that reveals any such factor. Thus, there is simply nothing to support the majority's position that there was a drug distribution agreement or something more than a buyer-seller relationship here.

Next, the majority says that "specific facts support the finding that . . . Delgado worked with a supplier and an intended buyer who shared her intent to further distribute the drugs in her possession." Majority Op. 13. First, the majority points to Vasquez's testimony that Delgado said she planned to return the marijuana "is evidence that Delgado and the supplier were working together with the shared goal of reselling the drugs." *Id.* at 14. The majority posits that "[w]hen a wholesaler attempts to cultivate a repeat customer by offering a return policy to a purchaser who he knows will resell the merchandise, the wholesaler takes an interest in the success of the customer's resale business," and "[t]hus, the jury could reasonably conclude, as it did, that Delgado conspired with her supplier." *Id.* I disagree.

There was no evidence of a "return policy" in this case. Vasquez testified that Delgado planned to take the marijuana back, not that her supplier had agreed to take it back. Thus, an inference is required to find that Delgado and her supplier had an agreement that she could return the drugs if her resale plan fell through. And another inference is required to find that such a return policy meant that a distribution agreement existed between Delgado and her supplier. Thus, this evidence violates the rule that "charges of conspiracy are not to be made out by piling inference upon inference." *Direct Sales*, 319 U.S. at 711. Moreover, each of these are unreasonable inferences having absolutely no evidentiary support in the record. "[W]e do not give the government the benefit of *every potential* inference but rather, only those inferences reasonably and

70

logically flowing from the other evidence." *Santistevan*, 39 F.3d at 258 (emphasis in original).

The second "specific fact" that the majority points to as proof of the conspiracy is "Vasquez['s] testi[mony] that Delgado was waiting to be paid by her buyer for the marijuana in advance of shipment." Majority Op. at 14-15. However, nothing in the record supports the assertion that Delgado was waiting for or expecting to be paid in advance of sale. Vasquez testified only that Delgado was waiting to receive some "money she was going to be paid, which, in turn, she was going to use to pay us off once the marijuana had been loaded inside the boxes." Vasquez then testified that Delgado had not been paid "for her part of the marijuana," but when asked "who was supposed to pay her?" Vasquez answered, "I am not aware of that." Vasquez never testified as to the source or reason for the payment of money on which Delgado was waiting. The evidence reflects that Delgado's trucking company was an ongoing business from which she received legitimate money payments for hauling shipments nationwide. *See Brown*, 186 F.3d at 664 (In deciding whether an inference is reasonable, "[w]e consider the countervailing evidence as well as the evidence that supports the verdict." (internal quotation marks omitted)).

The majority claims that by "[v]iewing this testimony in the light most favorable to the verdict, as we must, Vasquez confirmed that Delgado was expecting advance payment for the marijuana." Majority Op. at 15 n.16. Although it is true that we must "view[] the evidence in the light most favorable to the prosecution," *Jackson*, 443 U.S. at 319, we draw only "*reasonable* inferences from the evidence to support the verdict." *Percel*, 553 F.3d at 910 (emphasis added). Vasquez's testimony provides no reasonable basis to infer that Delgado was not going to ship the marijuana until she was paid. And even if it was reasonable to infer from Vasquez's testimony that Delgado was waiting for advance payment for the marijuana, yet another unfounded inference would

71

No. 07-41041

be required to prove the existence of a conspiracy—that advance payment for drugs necessarily implies a drug distribution agreement between Delgado and the buyer. But that is simply piling unsupported inferences upon inferences, which is insufficient to prove a conspiracy. *Direct Sales*, 319 U.S. at 711.

Moreover, the majority conflates evidence of advance payment and evidence that a defendant was "fronted" drugs on consignment or on credit—but they are exact opposites. Unlike sales on credit, a seller receiving advance payment from a buyer does not "indicate[] a strong level of trust and an ongoing, mutually dependent relationship," *Posada-Rios*, 158 F.3d at 860, and it does not support an inference of any further agreement between the buyer and seller. The majority misinterprets our precedent when it contends that "[r]eceiving fronted money in a drug deal is 'strong evidence of membership in a conspiracy because it indicates a strong level of trust and an ongoing, mutually dependent relationship.'" Majority Op. 15 (quoting *Posada-Rios*, 158 F.3d at 860). What *Posada-Rios* actually said is entirely different: "[T]he government also presented evidence that [the defendant] *purchased some of the cocaine on consignment*, which is 'strong evidence' of membership in a conspiracy because it indicates a strong level of trust and an ongoing, mutually dependent relationship." 158 F.3d at 860 (emphasis added) (quoting *United States v. Rodriguez*, 53 F.3d 1439, 1445 (7th Cir. 1995)). *Rodriguez*, in turn, discussed testimony that the defendant was seen delivering drugs to another person "without receiving payment." 53 F.3d at 1445. The court concluded that "[a]n individual's participation in drug deals which involve credit transactions such as 'fronting' is strong evidence of membership in a conspiracy." *Id.* (internal quotation marks omitted). In sum, there is absolutely no support for the contention that receiving advance payment for drugs—as opposed to providing drugs *before* receiving payment—is any evidence of a conspiracy. A simple illustration proves the point: Nearly every purchase from a mail order or internet vendor requires advance payment; but

72

it would be unreasonable to infer that a cooperative agreement exists between the vendor and customer whereby they mutually intend for the customer to further distribute the merchandise.

The majority next asserts that "Delgado referred to her intended buyer as 'the person who was going to work with her,' indicating that their relationship extended beyond one simple buy-sell transaction." Majority Op. 15. But that simply misstates the record. The prosecutor asked Vasquez, "according to her, did anything happen to the person she was supposed to deliver the marijuana to?" And Vasquez responded, "According to her information, the deal was going to be canceled because the person that was going to work with her had been arrested in McAllen, here in the Valley." It is disingenuous for the majority to say that this isolated piece of Vasquez's testimony is "significant evidence that Delgado conspired with her intended recipient in North Carolina." *Id.* at 14-15. Due process requires *sufficient proof of guilt beyond a reasonable doubt*, not mere speculation of guilt.

Finally, the majority says, "possession of a large quantity of drugs is not, by itself, sufficient to support a conspiracy conviction." Majority Op. 15. This is correct. *See Rivera*, 273 F.3d at 755. But the majority completely eviscerates this important bulwark against unsupported conspiracy convictions by also stating that "*the quantity of drugs*—over 500 pounds—*is itself evidence that Delgado was involved in a conspiracy*," because "it is evidence that can help 'justify the inference that more than one person must be involved in moving [the large quantity] toward its ultimate dispersal.'" Majority Op. 15 (emphasis added) (final alteration in original) (quoting *United States v. Barnard*, 553 F.2d 389, 393 (5th Cir. 1977)).[28] However, evidence that more than one person is

---

[28] The majority's reliance on *Barnard* is misplaced because in that case, there was substantial other evidence of the defendant's involvement in the conspiracy. 553 F.2d at 393. Therefore, *Barnard* does not cast any doubt on the firmly-established rule that the quantity

involved in moving drugs is simply not enough to reasonably support a finding beyond a reasonable doubt that Delgado had an agreement with a bona fide conspirator to further distribute drugs.  In fact, the record here made clear that Vasquez was involved in Delgado's plan to transport the marijuana to North Carolina, but Delgado could not have conspired with Vasquez because he was a government informant who did not intend to carry out the conspiracy.  *See Sears*, 343 F.2d at 142.  There must be more than just inference piled upon inference.

The evidence that the majority finds sufficient to prove *beyond a reasonable doubt* that a conspiracy existed is frankly shocking.  The  majority's analysis amounts to simply looking for "[a]ny evidence that is relevant—that has any tendency to make the existence of [an agreement to further distribute marijuana] slightly more probable than it would be without the evidence"—in other words, the majority looks for what "could be deemed a 'mere modicum'" of evidence.  *See Jackson*, 443 U.S. at 320.  In effect, the majority transmutes the sufficiency-of-the-evidence standard into the same "no evidence" standard that the *Jackson* Court rejected as incompatible with due process.  *Id.* ("[A] mere modicum of evidence may satisfy a 'no evidence' standard . . . .  But it could not seriously be argued that such a 'modicum' of evidence could by itself rationally support a conviction beyond a reasonable doubt." (alterations in original) (internal quotation marks omitted)); *see also* Newman, 68 N.Y.U. L. Rev. at 996 ("The fact that evidence is relevant does not automatically make it sufficient to support a criminal conviction.").  In other words, while the majority purports to decide that the evidence is sufficient, it appears that the majority actually means that the record is not "devoid of evidence."   This case shows that Judge Newman's compunction was not exaggerated: "My concern is that federal appellate courts . . . examine a record to satisfy themselves only that there is

---

of drugs is not itself sufficient evidence of the existence of a conspiracy.

some evidence of guilt and do not conscientiously assess whether the evidence suffices to permit a finding by the high degree of persuasion required by the 'reasonable doubt' standard." *Id.* at 993.

## IV.    Cumulative error

I also believe, unlike the majority, that we must vacate Delgado's conviction of possession of marijuana with the intent to distribute because her trial was rendered fundamentally unfair by the combined effect of a series of significant errors: (1) The prosecutor's improper statement during closing argument that Delgado, who did not testify, had lied to investigating officers—and the prosecutor's improper statement that the Government informant was credible, *which the majority completely ignores*; (2) the Government agent's nonresponsive testimony about unspecified and uncharged "narcotics trafficking" involving Delgado's company; and (3) the trial court's erroneous instruction that Delgado could be found guilty of possession if she had been deliberately ignorant to the presence of marijuana on her property, *despite the complete absence of a proper factual predicate for a deliberate ignorance charge.* These errors have been exacerbated on appeal by the 119 gaps *in both the audio recording and the transcript* of the trial record. The gap-filled transcript has deprived Delgado's new appellate counsel of a verbatim record of the trial, in violation of the Court Reporter's Act, 28 U.S.C. § 753(b), and limited her ability to present an effective appeal. The combined prejudicial effect of these errors brings this case squarely within the cumulative error doctrine, which "provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998). Because, in my view, the aggregation

No. 07-41041

of these errors deprived Delgado of a fair trial, I would vacate and remand for a new trial on the possession charge. *See Delgado*, 631 F.3d at 698-711.

## V.    Conclusion

"[I]t is far worse to convict an innocent man than to let a guilty man go free." *Winship*, 397 U.S. at 372 (Harlan, J., concurring); *see also Schlup v. Delo* 513 U.S. 298, 325 (1995) ("The maxim of the law is . . . that it is better that ninety-nine . . . offenders should escape, than that one innocent man should be condemned." (alterations in original) (internal quotation marks omitted)). This is why "[t]he Due Process Clause . . . protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged," *Winship*, 397 U.S. at 364, and why "an essential of the due process guaranteed by the Fourteenth [and Fifth Amendments is] that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense," *Jackson*, 443 U.S. at 316. This is also why "it is the imperative duty of a court to see that all the elements of [the] crime are proved," whether raised by the defendant or not. *Clyatt*, 197 U.S. at 222. Accordingly, it has been said, correctly in my view, that "[t]here is no such thing as a default judgment in the criminal law." 2 Childress & Davis, *supra*, § 9.12, at 9-39. And consequently, "the minimum level of evidence required to convict should not vary" whether or not the defendant properly raises it. *Id.*

In upholding Delgado's conviction on less than sufficient proof of guilt, the majority's opinion supports Judge Newman's conclusion that "the constitutional jurisprudence of this Nation has accepted the 'reasonable doubt' standard as a verbal formulation to be conveyed to juries . . . but has failed to take the standard seriously as a rule of law against which the validity of convictions is to

be judged." Newman, 68 N.Y.U. L. Rev. at 980; *see also id.* at 996 ("[M]y basic point [is] that courts do not take seriously their obligation to assess sufficiency of evidence in light of the 'reasonable doubt' standard[] [and] [t]hey end their inquiry upon noticing the existence of 'some' evidence of guilt."). Consequently, "we are convicting some people who are not guilty beyond a reasonable doubt." *Id.* at 980. I have no doubt that the majority's opinion, if followed, will lead to countless conspiracy convictions, which are not supported by sufficient evidence of an illegal agreement. I share Judge Newman's belief that "that the 'reasonable doubt' standard should express our society's view that criminal convictions require, at the least, a high degree of certainty of guilt." *Id.* at 981. Today's majority opinion runs contrary to this belief. The majority completely ignores all of the firmly established rules that have long guided our review for sufficiency of the evidence in conspiracy cases, such as this, which are based entirely on circumstantial evidence. In my view, the majority abdicates its "imperative duty . . . to see that all the elements of [Delgado's] crime are proved." *Clyatt*, 197 U.S. at 222.

Because I believe that the evidence is obviously insufficient to prove that Delgado entered into a drug distribution agreement with a bona fide conspirator, and that the cumulative effect of a series of significant errors rendered Delgado's trial fundamentally unfair, I would reverse and dismiss the conspiracy count and vacate and remand the possession count of the indictment for further proceedings. The majority reaches the opposite conclusion on both counts, and therefore, I respectfully dissent.